Filed 1/30/19

CERTIFIED FOR PUBLICATION

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| In re N.O., a Person Coming Under the Juvenile Court Law. | D074064 |
| SAN DIEGO COUNTY HEALTH AND HUMAN SERVICES AGENCY,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>A.R. et al.,<br><br>    Defendants and Respondents;<br><br>N.O., a Minor, etc.,<br><br>    Appellant. | (San Diego County<br>Super. Ct. No. SJ13182) |

APPEAL from an order of the Superior Court of San Diego County, Michael J. Popkins, Judge. Affirmed.

Patricia K. Saucier, under appointment by the Court of Appeal, for Minor and Appellant.

Katherine A. Clark, under appointment by the Court of Appeal, for Defendant and Respondent A.R.

Marisa L. D. Conroy, under appointment by the Court of Appeal, for Defendant and Respondent S.G.

Thomas E. Montgomery, County Counsel, John E. Philips, Chief Deputy County Counsel and Lisa M. Maldonado, Deputy County Counsel, for Plaintiff and Respondent.

INTRODUCTION

Welfare and Institutions Code section 364[1] governs status review hearings for dependent juveniles who remain or are placed back in the physical custody of their parents or guardians. Subdivision (c) of that section (hereinafter, section 364(c)) provides that the juvenile court "shall terminate its jurisdiction unless the social worker or his or her department establishes by a preponderance of evidence that the conditions still exist which would justify initial assumption of jurisdiction under Section 300, or that those conditions are likely to exist if supervision is withdrawn."

Thus, when a child welfare agency such as Respondent San Diego County Health and Human Services Agency (Agency) opposes termination of dependency jurisdiction, it bears the burden to show by a preponderance of the evidence the existence of the conditions set forth in section 364(c) to continue jurisdiction. Otherwise, the court "shall terminate its jurisdiction." (*Ibid.*) In the instant case, however, Agency not only did not oppose termination of dependency, but rather recommended it. Instead, it was counsel of

---

[1] All further statutory references are to the Welfare and Institutions Code unless otherwise noted.

2

dependent child N.O. (Minor) who opposed termination of jurisdiction over the objection of Minor's parents.

Complicating this case is the fact that it involved the coordination of welfare agencies from Mexico and the United States, after Mexico declined to exercise jurisdiction over Minor, who was detained in California when Minor's mother A.R. (Mother) was arrested at the international border for transporting a large amount of marijuana. Minor was ultimately placed by a California juvenile court with maternal grandmother in Mexico. A few months after her arrest, Mother was released from custody and returned to Mexico, where she participated in services through the agency Desarrollo Integral de la Familia (DIF), which services were ordered and overseen by the juvenile court and Agency. Because Mother made substantial progress in services under her Agency care plan, Minor was returned to Mother's care.

After a domestic violence (DV) incident between Mother and Minor's father S.G. (Father) in late December 2016 came to light in February 2017, Agency recommended Mother receive DV services, which were to be administered through DIF because Mother could no longer cross the border into the United States. When the court terminated jurisdiction in May 2018 it was unclear whether Mother had participated in such DV services. However, perhaps more important for purposes of this appeal, it also was unclear whether DIF had offered Mother such services, or believed they were even necessary.

Indeed, the record shows in the months leading up to Agency's November 2017 recommendation that jurisdiction over Minor be terminated pursuant to section 364(c),

3

DIF ignored the myriad requests of Mother—who had separated from Father, and moved from Ensenada to Tijuana without giving him a forwarding address—(i) to assess Minor, as required by Agency and ordered by the juvenile court, and (ii) to inform Mother whether she needed DV services and if so, where they would be provided and what type of services she would be offered. Equally important, the record also shows that during much of Minor's dependency, the communication of information from DIF to Agency was often delayed, with Agency sometimes receiving months-old information, or in some cases, no information at all, despite its admitted dependence on DIF.

Minor's counsel opposed Agency's November 2017 recommendation to terminate jurisdiction, noting Agency had not personally seen Minor since late May 2017 and Mother since late July 2017, and further noting Mother had then stopped returning phone calls and emails from Minor's counsel and Agency, the last contact between Mother and Agency being in late September 2017. Agency nonetheless recommended termination of jurisdiction because a social worker from DIF had assessed Mother and Minor, also in late September 2017, and had reported Minor was continuing to do well in her care, where Minor had been placed since December 2016; Mother had completed all services ordered by Agency under its original care plan; there was no evidence Mother and Father had reunited; and DIF had been unresponsive to Mother and Agency regarding whether it would provide Mother DV services, as noted.

After multiple continuances of the section 364 review hearing, the juvenile court on March 8, 2018, granted Minor's counsel one last continuance, noting that it was "comfortable" closing the case based on the information then available to it and that it did

4

not appear additional information regarding Minor would be forthcoming from DIF. The court suggested Agency reach out to DIF to make Minor's case a "priority" to "verify the minor and the mom are okay." When Agency at the April 5, 2018 continued review hearing again reported that it had no new information from DIF regarding Minor, at the request of Minor's counsel the court set a contested hearing for May 23, 2018.[2]

At the contested hearing, the court found that Minor had not met her burden under section 364(c) to show that conditions still existed that would justify the court's initial assumption of jurisdiction over her; that there was no reason to continue the review hearing until minor was found, as requested by Minor's counsel; and that it therefore was required to terminate jurisdiction.

On appeal, Minor contends the juvenile court's finding that conditions no longer existed in May 2018 that would justify the initial assumption of dependency over Minor in August 2015 was not supported by substantial evidence; that the court abused its discretion in not continuing the family maintenance review hearing until Minor was found and assessed; and that the juvenile court violated Minor's statutory right to counsel under section 317.

---

[2] As highlighted by this case, a cross-border dependency presents certain "challenges" to the social welfare agencies tasked with providing services to a dependent child and his or her parents or guardians. As summarized *post*, at the end of dependency it appears DIF had determined neither Minor nor Mother was in need of any additional services, after DIF assessed Minor and reported she was doing well in Mother's care. Nothing we say in this opinion is meant as a criticism of DIF, or the services it provided Minor and her family during this nearly three-year dependency.

As we explain, we conclude Minor failed to satisfy her burden to show at the contested hearing that conditions still existed which would justify the initial assumption of jurisdiction of her under section 300. Based on this conclusion, we reject Minor's contention that the court abused its discretion in refusing to continue the section 364 review hearing until Minor was found. We also conclude the court did not violate Minor's statutory right to counsel when it refused to continue the hearing, as the record shows Minor's counsel at all times vigorously advocated on Minor's behalf to ensure her safety and welfare. Affirmed.

FACTUAL AND PROCEDURAL BACKGROUND

*Petition, Detention, and Disposition*

As noted, in August 2015 Mother was arrested at the international border for smuggling a large amount of marijuana from Mexico into the United States. Fifteen-month-old Minor was in Mother's car at the time of her arrest. Mother denied knowledge of the presence of drugs in the car, stating instead she thought she was transporting money across the border. Mother was eight weeks pregnant with Father's baby at the time of her arrest.

Agency filed a dependency petition under section 300, subdivision (b)(1), alleging that Minor had suffered, or there was a substantial risk that she would suffer, serious physical harm or illness by her parents' willful or negligent failure to provide her with adequate food, clothing, shelter, supervision, or medical treatment arising out of the August 2015 incident. At Minor's August 31, 2015 detention hearing, the court found Agency made a prima facie showing on the petition and detained her.

6

At Minor's September 22, 2015 jurisdiction and disposition hearing, the court stated it retained jurisdiction of the case pursuant to the Uniform Child Custody Jurisdiction and Enforcement Act (Fam. Code, § 3400 et seq.) because the family courts in Tijuana and Ensenada, Mexico, had declined to exercise jurisdiction over Minor. In November 2015 the court sustained the petition's allegations based on a finding of clear and convincing evidence, and also granted Agency's ex parte request to place Minor with maternal grandmother in Ensenada, after she received a favorable home evaluation from DIF. During this same general time frame, Mother was released from custody and returned to Mexico.

At the contested disposition hearing on December 17, 2015, the juvenile court found by clear and convincing evidence that Minor should be removed from parents' custody pursuant to section 361.5, subdivision (a)(3) because there was, or would be, a substantial danger to her physical health, safety, protection, or physical or emotional well-being if she was returned home. The court declared Minor a dependent of the court and placed her in Agency's care and custody. Mother and Father were ordered to participate in reunification services in Mexico through DIF, which would be overseen by Agency.

*Six-month Review*

In its June 14, 2016 report for the six-month review hearing, Agency stated that Mother and Father were living together in Ensenada, working at a supermarket, attending parenting classes through DIF, and visiting Minor weekly. Agency noted during this reporting period that Mother had "successfully completed 12 psychological sessions"

7

through Instituto Municipal De la Mujer de Ensenada, where it "was reported that these sessions resulted in favorable advances through mother's therapeutic process." Agency also noted Minor was thriving in the home of maternal grandmother, as confirmed by home-visit reports provided by DIF. DIF also reported Minor was "functioning at an appropriate level in accordance with children of her age."

At the July 14, 2016 six-month review hearing conducted pursuant to section 366.21, the court ordered Minor remain placed with maternal grandmother and parents' reunification services be continued. The court found both Mother and Father had made "substantial" progress in services. The court ruled Agency had the discretion to "lift supervision of visits, allow overnight visits, [and] begin a 60[-]day trial visit with parents with [the] concurrence of [M]inor's counsel."

*Twelve-month Review*

In its report for the 12-month review hearing set for November 1, 2016, Agency recommended that reunification services be extended until the next review hearing. According to maternal grandmother, neighbors in Ensenada reported during this review period that Father in late June 2016 had "kicked" Mother out of their home after a verbal argument, which parents denied when questioned by Agency.

During this reporting period, Mother gave birth to Minor's sister on July 3, 2016, and was unemployed while caring for her newborn. As a result, maternal grandmother provided financial assistance to the family, as Father did not have a steady job. In May, Mother completed her parenting classes, and DIF conducted a welfare check of Minor in

8

maternal grandmother's home and reported Minor's needs were being met in a "loving family environment."

Also during this reporting period, maternal grandmother took Minor to the County of San Diego Public Health office in Chula Vista to update Minor's vaccinations. Agency conducted a "welfare check" on Minor during a follow-up visit. Maternal grandmother also provided Agency with updated "health documents" of Minor.

Agency social worker Alexis Troche noted during this reporting period he continued to work with DIF in Ensenada "to conduct compliance visits" on Minor and expressed concern about the "communication problems with the maternal grandmother in regards to getting [her] to send needed information" about Minor. Troche further noted that maternal grandmother became more "compliant" about providing such information after they discussed a possible change of placement for Minor

Agency in its report commented on the challenges presented by this case as a result of Minor and her family living in Mexico. Agency noted it was "difficult" "receiving information from the family," including from maternal grandmother, who, at one point during the reporting period, had refused to allow visits between Minor and parents because of an argument with Mother. Agency therefore noted it "depend[ed] on DIF for assessments of the parent's situation" and, as a result, the "reunification process" between Minor and parents was "slower."

Agency recommended parents undergo psychological evaluations, which commenced in October 2016. After Father tested positive for amphetamine or methamphetamine, Agency requested that DIF refer him to a substance abuse program.

9

Father agreed to participate and complete "any program referred to him," and in October moved out of the family home to facilitate Minor's return to Mother.

At the November 1, 2016 12-month review hearing, the court continued Minor's placement with maternal grandmother. The court again found parents had made substantial progress with their services and ordered them continued. It further ordered Mother have unsupervised visitation with Minor, and Father's visitation with Minor remain supervised. The court also directed Agency to speak with Mother regarding the difficulties Minor's counsel was experiencing in contacting Mother.

*Eighteen-month Review*

In its initial report for the 18-month review hearing set for March 1, 2017, Agency recommended that Mother have sole legal and physical custody of Minor with Father to have supervised visitation, and that the juvenile court terminate its jurisdiction over Minor. Agency reported Minor had been placed with Mother in December 2016 for a 60-day trial visit. Mother also cared for Minor's two sisters. Father did not live in the home, but provided Mother with some financial assistance. Mother opened her own business creating fruit bouquets.

During this reporting period, Mother reported that things were "going well," as maternal grandmother resided nearby and assisted Mother when necessary. Mother reported not seeing Father as much due to his "hectic work schedule," but claimed he nonetheless was "caring to his daughters, visits when he can, and [was] attempting services." In November 2016 Agency received reports and/or letters updating Minor's medical and dental history. Agency noted Minor was an "adorable, active and

10

affectionate toddler" who "appeared to be close to her parents, as evidenced by her running towards them and embracing them," as witnessed by Agency social worker Troche in the consulate visitation room.

In January 2017 father provided Agency a "stamped and dated log" showing he had attended 52 Narcotics Anonymous meetings during the reporting period. On January 31, 2017, Troche observed a visit between Minor and her parents, noting Minor "appeared highly attached" to parents, who likewise seemed equally attached to Minor. Agency stated it believed Mother had gained the knowledge to prevent any "future incidences that would put herself at risk[], such as being aware of the consequences of driving a vehicle with narcotics and by not allowing the father to be alone with the children if he appears to be under the influence. The Agency is aware of a strong support network for the mother by the maternal grandmother. The maternal grandmother has provided the mother with childcare, transportation, and financial assistance. The Agency is confident that with this support network and skills learned from services that further involvement by the Agency is not necessary."

Agency in its March 1, 2017 addendum report changed its recommendations for the 18-month hearing based on a report by maternal grandmother that Father on December 30, 2016, had struck Mother in the face and given her a "black eye," after accusing Mother of being unfaithful. Agency therefore sought a 30-day continuance of the 18-month hearing.

Agency's March 1 addendum noted it had contacted maternal grandmother in February 2017 after Agency had been unable to reach parents to arrange a welfare check

11

of Minor at the Mexican consulate in Tijuana. Maternal grandmother then disclosed the December 30 DV incident between Mother and Father. Maternal grandmother reported she had previously wanted to notify Agency of this incident, but had not done so because she " 'didn't want to get in [the] middle of it,' " adding that Mother tended to get "mad and blame[]" maternal grandmother for not getting Minor back sooner. Maternal grandmother reported that Minor's seven-year-old sister told maternal grandmother she heard Mother repeatedly yell for " 'help' " during the incident.

"[S]everal minutes" after speaking to maternal grandmother about the December 30 DV incident, Agency social worker Troche reached Mother, who confirmed the incident. Mother reported that the children, including Minor, were in another room when the incident took place, and that neighbors called the police and demanded Father leave the home. As a result of this incident, Mother did not speak to or see Father for about three weeks. Mother also reported that she received a "certified letter" from DIF on February 14, 2017, requiring her and the children, including Minor, to appear on February 20 at the offices of DIF for an assessment. Mother took her children on that date and were "assessed by DIF."

Mother reported to Agency that, because of the February 20 meeting with DIF, Father was "not allowed to be near the girls or where the mother works while they investigate the referral and if he disobeys 'they will remove the children.' " Mother admitted she did not inform Agency of the December 30 DV incident because she "didn't want the incident to affect her in losing her children . . . since it was the father that hit her. The mother reported DIF told her to not reside in her apartment for several days

12

until the father attends an unknown appointment on [February 25, 2017]."  Mother further "reported that the father told her on [February 20, 2017] that he will leave her alone, so [the] children won't be at risk of getting removed.  PSW Troche inquired if the mother felt safe, which [she] replied she did and has her mother for support."

Agency in its March 1 addendum noted it had received the psychological evaluation reports of parents dated February 13, 2017, which evaluations DIF had ordered almost four months earlier.[3]  Father's report described him as " 'infantile and immature with little capability to recognize the faults related to the legal situation of his daughter and family.' "  It further described Father as " 'depressed, uneasy, unstable, anxious, and distracted,' " and noted Father also showed signs of " 'aggressiveness and impulsiveness.' "

Mother's February 13 report stated Mother did not appear to be " 'stable within her current environment as she lives with [Father] who is the biological father of her two youngest children,' " including Minor.  It recommended that she maintain a stable job, and, despite already successfully completing individual therapy, that she attend additional therapy to learn how to be more responsible and to develop strategies for caring for her children.

Agency in its March 1 addendum concluded that, although there was a new incident of DV during the reporting period, Mother nonetheless had "been protective by not allowing the father to reside in her residence and she is also going to not allow

_____

3    The February 13 reports were included in the record based on Minor's augment request, which this court granted on August 3, 2018.

contact with children until DIF completes [its] investigations. The mother has completed all services in her case plan, which were designed to eliminate the reason the Agency initially got involved. The mother has tested clean during drug tests and has not been partaking in illegal activities and has not been rearrested. The mother has completed her 60[-]day trial and even though she was not upfront with [regards to the] alleged DV incident, DIF is currently assessing the situation. Being that the children are placed in Mexico, the Agency has had difficulty in receiving DIF reports on time when [it] conduct[s] the welfare visits on Agency's behalf, since the parents cannot cross with [M]inor . . . . The mother appears to [be] cooperative with DIF [and] with [its] investigation, as evidenced by her moving out briefly to reside with her friend to avoid contact with the father and even to finally disclosing to [an Agency social worker] of [the] incident."

The juvenile court at the March 1, 2017 18-month review hearing continued the matter to allow Agency to "investigate some of the concerns that the agency has regarding closing this case at this time." The court ordered that Mother could no longer supervise Father's visits with Minor.

Agency in its March 29, 2017 addendum report recommended another continuance of the 18-month review hearing. Mother informed Agency that she no longer was supervising visits between Father and the children, including Minor, and that she did not know Father's whereabouts. Finally, Mother reported she did not show up to a followup appointment with DIF on or about February 23, 2017, because Father had

14

received the appointment reminder, and he never gave it to her, or notified her that she also needed to attend with him.

Agency in its May 30, 2017 addendum repeated its earlier recommendations that Minor continue as a dependent of the juvenile court; that Minor remain in Mother's care; that Mother be offered six months of family maintenance services; that Father's reunification services be terminated; and that visits between Father and Minor remain supervised by someone other than Mother.

The May 30 addendum reported Agency contacted Mother on April 18. When told Agency had been attempting to contact Mother for "over a month," Mother claimed her phone had stopped working after she had dropped it, and she had just had it fixed. Mother stated she had not seen Father in two months, Father was likely residing with paternal grandmother, and that nobody from DIF had reached out to her, including in regards to the December 30 DV incident.

Mother further reported she had recently moved. Mother provided Agency with her new address, but stated she had not given it to maternal grandmother, who, according to Mother, had " 'been causing trouble,' " after maternal grandmother had lobbied a friend to remove various items Mother was using to operate her business. Mother thus began working at a convenience store in order to support her children, including Minor. Agency asked Mother to bring Minor to the consulate office during the week of April 24; however, due to "unavailability," Agency was unable to schedule the visit.

Agency again spoke with Mother on April 27. Mother reported she had contacted DIF the day before and DIF "told her [it] had 'no concerns.' " According to Mother,

15

"a DIF social worker stated they could provide a letter to Agency stating there are no concerns with the mother. The mother clarified that after the domestic violence incident, which occurred in December 2016, she didn't see the father until [January 20, 2017] in which they discussed her concerns about his actions. The mother stated that the father 'asked for forgiveness.' The mother reported that in February, the father was delivering for her business and stayed with her and the children for 3 days until Agency discovered information about the domestic violence incident. The mother stated that she and the father went to their scheduled DIF visit. The mother reported not seeing father until she accidently walked into him when she was providing paternal grandmother with a visit."

Agency in its May 30 addendum reported having additional contacts with Mother in May 2017 including on May 17 and 23. During one of these telephone calls, Mother was asked about an alleged DIF appointment that had been scheduled on May 8, 2017. Mother admitted that "she had forgotten about [the] appointment but when she was initially given [the] appointment she [had] called DIF in April and asked DIF if [it] could change the case to Tijuana, Mexico due to travel expenses"; that DIF was in the process of making this change; and that Mother herself would follow up as DIF ostensibly was also appointing a new social worker for her case. Mother reported she had been in contact with maternal grandmother, who agreed Mother and the children, including Minor, could reside with her "to resolve anything DIF needs in Ensenada."

Mother along with Minor visited Agency social worker Troche at the Mexican consulate on May 25. Mother reported that she was actively using many of the "tools" she had learned through the reunification services offered by Agency; that she had left

16

Father and not given him her new address because of the December 30 DV incident and because he was "very inconsistent" in attending services, which put her children, including Minor, at risk; and that she did not go back to DIF after the initial visit on February 20 because DIF had not asked Mother to do anything else, but instead was focusing on Father, who needed to enroll in a substance abuse program and other services before he could have contact with the children, including Minor.

Mother also reported that she and the children had moved back to Ensenada and was living with maternal grandmother because Mother needed the "financial assistance" and "want[ed] to clear and complete any services DIF needs her to complete to close [the] case." Mother stated she planned on working in Ensenada for a few months and then moving with the children to Puebla, Mexico, to live with maternal grandfather, as he would be retiring soon and "would be able to assist her financially while she works and cares for the children," including Minor. Mother expressed the difficulty she was experiencing in "raising her three children alone with limited financial assistance from the fathers' of her children," as she had only received 2000 pesos over a four-month period.[4] Mother also reported that maternal grandmother planned on moving to the United States in mid-July, when Minor's maternal uncle would be starting high school.

---

[4] Pursuant to Evidence Code section 452, subdivision (h), we take judicial notice of the fact that 2000 pesos on May 25, 2017 was the equivalent of about $108 U.S. dollars. (See Mexican Peso (MXN) To United States Dollar (USD) Exchange Rate on 25 May 2017 (25/05/2017) <https://mxn.fxexchangerate.com/usd-2017_05_25-exchange-rates-history.html> [as of January 29, 2019], archived at <https://perma.cc/K82Q-3EZX>.)

During the May 25 in-person visit, Agency social worker Troche noted Minor appeared "happy, as evidenced by Minor walking around the consulate room, attempting to utilize PSW Troche's computer and eating a sandwich the mother had prepared for her. [Minor] did not appear to be scared of the mother as evidenced by her running around the room, stopping at times to talk to her mother and laughing. The mother provided her with attention."

The record shows that Mother appeared by telephone at the 18-month review hearing held on May 30; that Father "submit[ted]" to the recommendation of Agency that his reunification services by terminated; that Mother also submitted to Agency's recommendation that she be offered "family maintenance services" and would continue to care for Minor; and that Minor's counsel also submitted to Agency's recommendation, but expressed concern about the lack of information "not necessarily all due to the mother's actions, but also because [DIF]—it's been hard to communicate with [DIF], and it takes a while for [DIF] to set up appointments."

Minor's counsel requested the court admonish Mother of the importance of attending all DIF appointments and staying in "consistent" and "honest communication" with Agency. The record shows Mother, through an interpreter, agreed to remain in contact with Agency. The court informed Mother if she kept her appointments and remained in contact with Agency, there was a "good chance that this case will be terminated at the next hearing." The court, after adopting Agency's recommendations, set the case for a "family maintenance review hearing" on November 30, 2017, and ordered Mother to appear (telephonically) for that hearing.

18

*Family Maintenance Review Hearings*

Agency in its November 30, 2017 status review report recommended that Minor be placed with Mother and Agency's jurisdiction terminated, as noted *ante*; that Mother be granted legal and physical custody of Minor; and that Father have reasonable visitation supervised by an "approved family member." Agency noted Minor then was residing with Mother at a specified address in Ensenada. During the reporting period, Mother had obtained employment as an "Uber" driver, giving her the flexibility to take and pick up the children, including Minor, from school, and allowing her to be available for the children in case of emergency.

Agency's November 30 report noted Agency social worker Troche contacted Mother on June 23, and 30, and on July 24, 2017, regarding whether DIF had arranged a DV referral for Mother. Mother reported she had attempted "several times" to contact DIF social workers about such services. Troche reported that Mother also had reached out to him for "assistance to contact DIF to expedite [the] referrals from DIF." During an in-person meeting between Troche and Mother on July 31, Mother reiterated she had not heard back from DIF, despite her many calls to the agency. Mother thus stopped calling the agency. Mother again asked for Agency assistance in arranging a referral through DIF. Troche agreed to investigate the matter on behalf of Mother.

Agency's November 30 report noted Mother contacted Troche on August 30, stating her friend was having car trouble and thus, she had arrived at the consulate after her scheduled time. Troche confirmed he had a missed call from Mother at 7:37 a.m. that day. Mother expressed her frustration at being unable to afford to travel to Tijuana with

19

Minor to participate in such visits at the consulate, and at DIF "not being compliant with her or seeing [M]inor for the Agency's behalf." Agency reported a new consulate visit was arranged, but Mother failed to show up with Minor for that visit.

Agency attempted to contact Mother on September 19, 20, 26, and 27, sometimes leaving voicemails on Mother's phone. The Agency reached Mother on September 28, after calling the telephone number for maternal grandmother. Mother informed Agency social worker Troche that her telephone had stopped working. Mother stated she finally had received a letter from DIF, who would assess Minor on September 29. Troche reminded Mother to discuss with DIF her need for DV services.

Troche reported that, since his September 28 contact with Mother, he had been unable to reach Mother, or maternal grandmother, despite leaving, or attempting to leave, them voicemails on October 4, 26, 27, 30, and on November 17, 2017.

The Agency's November 30 status report noted during the reporting period that Agency had multiple communications with social worker Martha Sanchez, an "International Liaison," regarding making an international referral on Mother's behalf. Sanchez on August 22 contacted Agency and reported that DIF had not provided her with "any new information" regarding Minor. On September 26, Sanchez contacted Agency and reported that DIF had "attempted to see minor and a note was left with an appointment date, since she was not at the address at the time of visit."

On November 3, Sanchez informed Agency that DIF had been unresponsive and had failed to provide her with any updates regarding Minor. On November 9, Sanchez informed Agency that DIF had "finally" given Sanchez an update, as Mother was seen by

20

a DIF social worker on or about September 28; that the social worker reported Minor was "doing well" in Mother's care; and that an attorney had been assigned to Mother's DV case, but it was "uncertain" whether DIF had provided Mother with a referral for DV services.

Agency in its report noted it had no contact with maternal grandmother or Father during the reporting period. Agency also noted Minor had a physical on July 31 that was completed in Mexico by Minor's primary care physician. Agency also noted that Minor was developmentally on-track; and that Minor was attending preschool in Ensenada. Agency recognized Mother did not participate in any services during the reporting period because Mother had "successfully completed them during the prior reporting period."

In connection with its recommendation that jurisdiction over Minor end, Agency in its November 30 report stated as follows: "Even though the Agency has been having difficulty in contacting the mother to receive updates and to schedule consulate visits during the last two months, the mother was actively attempting to contact DIF on numerous occasions to receive referrals and to allow DIF to conduct welfare visits on Agency's behalf with [Minor]. DIF was eventually able to assess the minor's well-being and concluded that the minor appeared well, not at risk, and did not report any new domestic violence altercations with father. Since the mother appears to be in contact with DIF, the Agency hopes she will continue to work with them and accept any services or referrals they provide.

"The mother has completed her initial services in her case plan of Parenting Education and Individual therapy which were designed to eliminate the reason the

21

Agency initially got involved. The mother was able to provide examples of what she learned and utilizes [them] with the minor when she met with PSW Troche. The mother additionally has been able to utilize the maternal grandmother for housing, child care, and support. The minor . . . is currently placed with mother and appears to be doing well and all of her needs appear to be met by the mother. The mother has been working a [full-time] job and providing the necessities for the minor. The mother has refrain[ed] from any criminal activity.

"During the visits, PSW Troche has been able to assess the mother's interactions with the minor. PSW Troche strongly believes that the mother has been able to positively display an appropriately positive, safe, loving environment to the minor . . . and that mother has gained the knowledge to prevent any future incident that would put [Minor] and her other children at risk."

The record shows Mother did not appear—including telephonically—at the November 30 hearing, despite the court's previous order. Agency sought a continuance of this hearing due to a notice issue with respect to Father. The court thus continued the family maintenance review hearing to January 11, 2018.

At the January 11 hearing, Minor's counsel referenced the year-old DV incident, stating that incident was "very concerning" because after it took place, Mother went back to Father. Minor's counsel argued she was unable to do any investigation regarding her client, and the juvenile court could not make any findings as requested by Agency, because the last contact between Minor and her counsel was prior to May 30, 2017;

22

Agency had not had any contact with Mother since July 31, 2017;[5] and the last contact between DIF and Mother was on or about September 28. Minor's counsel thus requested a continuance to allow DIF the opportunity to visit Minor in Mother's home. Minor's counsel stated if the continuance was not granted, she "would be willing to do a doc trial today."

The juvenile court continued the family maintenance review hearing. In so doing, the court stated it would "like to see DIF at least make another contact to see how the minor is doing before we make any final call on terminating jurisdiction on this case," given DIF's last contact with Minor was on or about September 28. The court thus continued the matter to March 8, 2018.

Agency's March 8 addendum report noted Agency had unsuccessfully attempted to contact Mother on January 24, and on February 7 and 23, 2018. Agency's attempts to contact maternal grandmother and/or Father were also unsuccessful. Agency on January 12 forwarded an international referral to DIF to conduct a welfare check on Minor. On February 23, Agency contacted Sanchez, who informed Agency she had no updates regarding Minor. Agency thus reiterated its previous recommendations, including that jurisdiction over Minor be terminated.

---

5 As noted *ante*, the record shows that Mother contacted Agency social worker Troche on August 30, 2017, complaining about DIF and its failure with her including to assess Minor on Agency's behalf; and that Troche was able to speak with Mother on September 28 about a welfare check for Minor that was conducted by DIF on that day or the day following.

23

At the March 8 hearing, Agency disclosed it had no new information regarding Minor, including from DIF. Minor's counsel noted that Mother was not returning counsel's phone calls, nor responding to emails. Minor's counsel thus sought an additional continuance of the review hearing to allow DIF to "see" Minor and obtain an assessment of her.

Minor's counsel reiterated at this hearing that the nearly 15-month-old DV incident was her "only concern" about terminating jurisdiction over Minor, as "Mexico was to supply services to address that issue," there was "evidence that DIF—that mother never engaged in those services," and thus, there was an "untreated mother for DV." Minor's counsel stated she, like others, shared the view that it was possible they might "be stuck in the same situation continually" if the case was continued; but that the court "should at least get DIF to try to visit the minor."

The record shows Agency shared the frustration of Minor's counsel regarding communication—or lack thereof—with Mother and others in her family, and the lack of "any cooperation" from DIF to assist Agency in connection with this case. Agency nonetheless asked the court to terminate jurisdiction, as it no longer believed another 30-day continuance would provide any feedback from DIF regarding Minor's well-being. The record shows Mother's counsel also recommended termination of jurisdiction.

The juvenile court noted Minor had been with Mother since May 2016;[6] that it was "comfortabl[e]" closing out the case; that the court could not just keep dragging the

---

[6] The record shows Minor actually was placed with Mother in December 2016.

case out "forever and ever"; and that just because Minor had not been seen since late September 2017 that alone did not mean "there's anything bad going on." The court nonetheless agreed to a 30-day continuance, but stated it would be the last one, "barring something unforeseen." The court suggested Agency ask DIF to make Minor's case a "priority" and "just verify the minor and the mom are okay."

At the April 5, 2018 continued hearing, Minor's counsel requested trial dates regarding the court's intention to terminate jurisdiction, after Agency disclosed it had no additional information from DIF concerning Minor. Mother's counsel reiterated her request that jurisdiction over Minor be terminated, as the court already had continued the family maintenance review hearing for "three months" and she already had provided the court and all parties with "proposed custody orders." The court set the contested review hearing for May 23, 2018.

*Final Family (Contested) Maintenance Review Hearing*

Agency in its May 23, 2018 addendum report noted Sanchez on April 19, 2018, forwarded a DIF report also dated April 19 stating that social worker Mayra Nayeli Richie Rodriquez had attempted to visit Mother's home on three occasions in August and September 2017 with no success in locating anyone; that on her last visit, Rodriquez had left a "citation for the mother to appear with the minor on [September 29, 2017]"; and that Mother did in fact appear with Minor and one of her other children on that date. Rodriquez "reported that the minors appeared to be in 'good hygienic conditions' "; that Mother stated she was rarely home as she awakened early to take the children to school and did not return home until nighttime; that maternal grandmother had moved to the

25

United States; and that Mother and the children, including Minor, were still residing in maternal grandmother's home.

Rodriquez further reported she attempted to visit Mother on February 19 and March 13, 2018; that no one was at the residence on those occasions; that a neighbor claimed not to have seen Mother or her children, including Minor, for a " 'long time' "; that the phone number for maternal grandmother was no longer active; and that calls made to Mother's telephone went straight to voicemail.

At the May 23 hearing, Minor's counsel opposed termination of jurisdiction over Minor because Agency's last "contact" with Mother was on or about September 29, 2017, or more than six months earlier. As such, Minor's counsel argued that the juvenile court lacked the ability to make findings necessary to terminate jurisdiction; that it was "bad policy to award parents for absconding with their children while a dependency proceeding is pending"; and that Minor was still "at risk" because her parents were "untreated for domestic violence" and Father was untreated for drug abuse.

The record shows the court admitted all of Agency's reports, as summarized *ante*. At Minor's counsel's request, the court took judicial notice of its minute orders of May 30, 2017, in which the court had admonished Mother to keep all DIF appointments and remain in communication with counsel and Agency, and of November 30, 2017, when, despite the court's previous order, Mother had not appeared telephonically for the hearing. The record shows Minor's counsel next called Agency social worker Troche as a witness.

26

Troche testified he had been assigned to the instant case for more than two years; that he then did not know Minor's circumstances or whereabouts; that he did not know whether Father was living with Mother, but had no reason to suspect he was; and that, testifying as an expert based on his experience as a social worker, he did not believe Minor was at risk. When asked to explain his answer, Troche stated when he viewed Minor and Mother together, they appeared very bonded, and Minor healthy, which DIF confirmed when one of its social workers met with Mother and Minor in late September 2017. Troche testified he did not know whether Minor was at risk on the day of the contested hearing, nor did he know whether Mother had enrolled in a domestic violence program in Mexico.

Troche further testified Agency searched for Minor in the United States about a year earlier. The search, conducted through a "parent search clerk," yielded no results. Troche confirmed that Mother completed all the services offered by Agency; that Mother was supposed to receive some domestic violence services through DIF, but was unsure whether such services were ever offered by DIF and if so, whether Mother completed them; and that the last time Minor had been seen by any agency was at the end of September 2017 by a DIF social worker. Troche testified DIF provided this information in a report, which was silent on whether DIF had offered Mother DV services.

Agency during closing argued the court should follow its recommendations from its November 30, 2017 status review report, including that Mother be given custody of Minor and jurisdiction be terminated. Agency acknowledged the potential concerns raised by Minor's counsel over a lack of recent contact with Mother, but argued lack of

27

contact did not equate to Minor being at risk or to the court needing to continue supervision over Minor, as all information then available showed Minor had been doing well, Mother had completed all services requested by Agency, and there were no reports of any new instances of DV following the December 30 incident, which had occurred about 18 months earlier.

Agency further argued that it lacked jurisdiction to "practice social work in Mexico"; and that it therefore was dependent on DIF to do the social work for Agency. Agency explained: "So, if the Court were to continue jurisdiction over this case, it's unclear what could be accomplished, frankly, as far as continued investigation. Essentially, all the parties in the court would have to rely on DIF to continue to work on this case. And as noted in the reports, you know, that we've been having trouble getting in contact with them. They haven't been extremely compliant."

Minor's counsel in closing argued that the instant case was a "factual mess" because the information sent by DIF was always three or fourth months old. The record shows Minor's counsel engaged in a lengthy closing argument, in which counsel exhaustively went through the facts contained in Agency's reports, which already had been admitted into evidence, and reviewed myriad cases, none of which the juvenile court found applicable to the unique facts of the instant case.

Toward the end of her argument, Minor's counsel stated the court should *presume* Mother and Father had reunited. The court interrupted Minor's counsel and suggested she was asking the court to "speculate" they were back together. Counsel in response argued, "I think we have to speculate because of the situation we're in." Minor's counsel

28

then continued to argue that she believed parents were together "because they have a relationship together, and the only reason why the mother and father [were] separated was because they believed that this case would be over sooner if they did so."

*Juvenile Court Rules to Terminate Jurisdiction Over Minor*

After a recess, the juvenile court noted that, based on *In re Aurora P.* (2015) 241 Cal.App.4th 1142 (*Aurora P.*), the burden was on Minor to show by a preponderance of the evidence that the conditions that justified "initial assumption of jurisdiction" of Minor under section 300 still existed, inasmuch as Agency was seeking to terminate jurisdiction. Minor's counsel in rebuttal argued that, because Minor was still "missing" as a result of the actions of Mother, the court "should not award that behavior by closing the case and that we should continue to look for the minor until we can make an assessment that the minor is safe." Thus, Minor's counsel asked the court to "continue the case until the minor is found," and to issue a "bench warrant" for Mother and a "pick up/detain order" for Minor.

In ordering jurisdiction over Minor terminated, the court noted that dependency began in 2015, or "three years ago," and that the "original conditions that justified the taking of jurisdiction in this case involved mom transporting drugs with the minor in the car." The court found that Mother had successfully completed the services asked of her by Agency; that during the 18-month review in late March 2017, the December 30 DV issue came to light, leading Agency to ask for a continuance of the case to conduct further investigation; that DV was not the "initial problem that justified this Court taking jurisdiction," as it happened while the case was pending; and that at the next hearing on

29

May 30, 2017, when Mother appeared telephonically, the Court found "mom had actively involved herself in the case plan," the plan was "appropriate, reasonable, and likely to be successful in alleviating the causes that brought this matter before the Court," and "the extent of progress made by the mom has been substantial."

The court also noted that Agency had seen Minor "about a year ago," and at that time "there was no indication whatsoever that mom or the minor was doing anything inappropriate, or the minor was in any danger"; that it continued Minor's placement with Mother despite the December 30 DV incident; that DIF saw Minor in late September 2017 which was the "last time anyone has seen the minor or the mom"; and that then "everything was going appropriate," "the mom was doing everything . . . to protect the minor," and there was "no reason to believe that the minor was in any danger whatsoever."

The court further noted only two months later, on November 30, 2017, Agency recommended termination of jurisdiction over Minor. The court stated: "That matter was continued, but that's when this recommendation first came up and that was simply just two months after the mom was seen. It wasn't—we're talking about now—it's been over six months, but part of [the] reason it's been so long is because this case has been continued numerous times. It was continued by minor's counsel in January so I could give them an opportunity to—or give them an opportunity to have DIF to see the minor. It was continued again from March, again, to get feedback from DIF, and we haven't been able to get that.

30

"But, on the other hand, we have no evidence whatsoever, based on the only evidence that we have, that the minor's in any danger or that the conditions that initially justified the assumption of jurisdiction exist in this case. Even assuming that the domestic violence becomes a part of this—and I'm not so sure under the law it does necessarily. But even assuming that it does, because that's not what got us the initial jurisdiction in this case, and that's the way [section] 364(c) reads to me—but even taking that into consideration, the fact that she was seen a year ago by our agency and was seen again in September, there were no indications that any of that danger still existed as recently as September.

"Based on that case I mentioned, *In re Aurora P.*, the default for the Court is to terminate jurisdiction, unless I have some evidence to show otherwise. They also indicate that the burden of proof now switches to minor's counsel, since the Agency now agrees that jurisdiction should be terminated. And I, frankly, do not find by a preponderance of evidence that minor's counsel has shown that conditions still exist that would justify the—that justify the initial assumption of jurisdiction in this case, and I will follow the recommendations of the Agency and terminate jurisdiction in this case. And those would be the recommendations from the November 30th, 2017, report, which I have read and considered. I will adopt those as the Court's findings."

DISCUSSION

I

*THE JUVENILE COURT PROPERLY TERMINATED ITS JURISDICTION UNDER*
*SECTION 364(c)*

A. *General Principles Governing Dependent Minors Who Remain in, or Are*
*Returned to, Parental Custody*

After a juvenile court finds a child is a person described in section 300, it must

"hear evidence on the question of the proper disposition to be made of the child." (§ 358,

subd. (a).) In appropriate circumstances, the court may declare the child a dependent and

"order family maintenance services to ameliorate the conditions that made the child

subject to the court's jurisdiction," while keeping the child with his or her family.[7]

(*Bridget A. v. Superior Court* (2007) 148 Cal.App.4th 285, 302.) Once a child has been

declared a dependent, the juvenile court must review the status of the child every six

months. (*Id.* at p. 303; see Cal. Rules of Court, rule 5.710(a) (1) [noting "[i]f the child is

returned, the court may order the termination of dependency jurisdiction or order

continued dependency services and set a review hearing within 6 months"].)

"The applicable standards at the six-month review hearing differ depending on the

---

[7] Family maintenance services are "activities designed to provide in-home
protective services to prevent or remedy neglect, abuse, or exploitation, for the purposes
of preventing separation of children from their families." (§ 16501, subd. (g).) They
"may be extended in periods of six-month increments if it can be shown that the
objectives of the service plan can be achieved within the extended time periods . . . ."
(§ 16506.) Unlike family reunification services, nothing in the Welfare and Institutions
Code or the California Rules of Court limits the time period for court supervision and
services for dependent minors who remain at home, so family maintenance services may
be provided until the dependent minor reaches the age of majority. (*In re Joel T.* (1999)
70 Cal.App.4th 263, 267-268.)

child's placement." (*In re Maya L.* (2014) 232 Cal.App.4th 81, 98.) Section 364 provides the standard when "a child under the supervision of the juvenile court . . . is not removed from the physical custody of his or her parent or guardian." (§ 364, subd. (a); see *In r Pedro Z., Jr.* (2010) 190 Cal.App.4th 12, 20 (*Pedro Z.*) [noting "when the child remains in a parent's home, the court reviews the status of the case every six months under section 364"].)

Despite the "not removed" language of section 364, subdivision (a), this court, like most other California appellate courts, has concluded that section 364 also applies in cases such as the instant one, where a dependent minor is removed from the physical custody of a parent and/or guardian and later *returned* to that parent and/or guardian. (See *In re Gabriel L.* (2009) 172 Cal.App.4th 644, 650 [disagreeing with *In re Sarah M.* (1991) 233 Cal.App.3d 1486, 1493, which held that § 364 applies only in situations where a dependent minor has never been removed from a parent or guardian] overruled on another ground as stated in *In re Chantal S.* (1996) 13 Cal.4th 196, 204; *In re N.S.* (2002) 97 Cal.App.4th 167, 171-172 (*N.S.*) [same].)

At the section 364 review hearing, the juvenile court is not concerned with reunification, but in determining whether the dependency should be terminated or supervision is necessary. (*Aurora P., supra*, 241 Cal.App.4th at p. 1155; *Pedro Z., supra*, 190 Cal.App.4th at p. 20.) The juvenile court makes this determination based on the totality of the evidence before it, including reports of the social worker who is required to make a recommendation concerning the necessity of continued supervision. (*Aurora P.*, at p. 1155, citing § 364, subd. (b); see *In re Armando L* (2016) 1 Cal.App.5th 606, 615

33

(*Armando L.*) [same].)

"The language of section 364 does not literally require that the precise conditions for assuming jurisdiction under section 300 in the first place still exist—rather that conditions exist that '*would* justify initial assumption of jurisdiction.' " (*In re J.F.* (2014) 228 Cal.App.4th 202, 210 (*J.F.*); cf. *In re D.B.* (2015) 239 Cal.App.4th 1073, 1085 (*D.B.*) [citing to *J.F.* and stating in dictum that the "better interpretation of section 364(c) is that the court must terminate jurisdiction if the conditions that justified taking jurisdiction in the first place no longer exist," recognizing § 364(c) "does not simply refer to 'conditions' or 'any conditions' but states the court shall terminate jurisdiction unless the social worker proves that '*the* conditions *still exist* which would justify *initial* assumption of jurisdiction under Section 300' "].)[8]

"Section 364, subdivision (c) establishes a statutory presumption in favor of terminating jurisdiction and returning the children to the parents' care without further court supervision." (*Armando L., supra*, 1 Cal.App.5th at p. 615; *In re Shannon M.* (2013) 221 Cal.App.4th 282, 290.) As noted *ante*, section 364(c) requires the juvenile court to "terminate its jurisdiction unless the social worker or his or her department establishes by a preponderance of evidence that the conditions still exist which would justify initial assumption of jurisdiction under Section 300, or that those conditions are likely to exist if supervision is withdrawn." (§ 364(c); *Conservatorship of Hume* (2006)

---

8 Like the court in *D.B., supra*, 239 Cal.App.4th at p. 1085, we decline in the instant case to address this issue because the juvenile court could have terminated dependency jurisdiction under either interpretation of section 364(c).

140 Cal.App.4th 1385, 1392 [interpreting § 364(c) to mean that, in the absence of a contrary showing at the six-month review hearing, termination of dependency jurisdiction will be the "default result"].)

Although section 364(c) states the social worker or department establishes the basis for the continuation of dependency jurisdiction, the first sentence of section 364(c) makes clear that the parent, the guardian, or the child may offer evidence on that question: "After hearing any evidence presented by the social worker, the parent, the guardian, or the child, the court shall determine whether continued supervision is necessary." (§ 364(c); see *Aurora P., supra*, 241 Cal.App.4th at p. 1155.) Moreover, "even if a social worker or department recommends termination of dependency jurisdiction, the juvenile court is not bound by that recommendation and may retain jurisdiction 'if there is a preponderance of evidence that the conditions are such to justify that retention.' [Citation.]" (*Aurora P.* at p. 1155; see *D.B., supra*, 239 Cal.App.4th at p. 1086 [noting a social service agency's recommendation is not binding on the court].)

B. *Burden of Proof and Standard of Review*

The court in *Aurora P.* addressed a similar issue to the one presented in the instant case, as the welfare agency there had recommended termination of dependency jurisdiction under section 364(c) over the objection of the minors' counsel. In *Aurora P.*, the welfare agency filed dependency petitions as to five of the mother's children. The mother, however, made significant progress resolving the problems that led to removal, as she was "actively engaged, was in compliance with her case plan, and was making positive strides towards reunification with her children." (*Aurora P., supra*,

35

241 Cal.App.4th at p. 1148.) At the 12-month review hearing, the juvenile court in *Aurora P.* followed the recommendation of the welfare agency and returned the mother's oldest and youngest daughters to the mother with family maintenance services. As the mother continued to make progress, the court returned the remaining children to her custody, also with family maintenance services. (*Ibid.*)

At a contested multi-day hearing in July 2014, following family maintenance review hearings in 2012, 2013, and in May 2014, the juvenile court adopted the Agency's recommendations, dismissed the case, and ordered informal family maintenance. (*Aurora P., supra*, 241 Cal.App.4th at pp. 1148, 1152-1153.) In so doing, the juvenile court found there were still " 'some concerns' " about the mother taking care of five children. (I*d.* at p. 1153.) The court, however, noted that was " 'not the standard' " it was to apply (*ibid.*), as it found " '[c]onditions do not exist which would justify initial assumption of jurisdiction under section 300 and are not likely to exist if supervision is withdrawn.' " (*Ibid.*)

The *Aurora P.* court noted that section 364(c) was silent "on which party bears the burden of proof where the social services agency recommends termination and another party opposes that recommendation." (*Aurora P., supra*, 241 Cal.App.4th at p. 1159.) Nonetheless, after analyzing section 364, including its legislative history, case law, and Evidence Code section 500[9] among other authorities, the *Aurora P.* court concluded that

---

9    Evidence Code section 500 provides: "Except as otherwise provided by law, a party has the burden of proof as to each fact the existence or nonexistence of which is essential to the claim for relief or defense that he [or she] is asserting."

the "status quo" under section 364(c) was termination of dependency jurisdiction; and that as such, the " 'default result' " would be termination "unless either the parent, the guardian, or the child objects and establishes by a preponderance of the evidence that conditions justifying retention of jurisdiction exist or are likely to exist if supervision is withdrawn." (*Aurora P.*, at p. 1163.)

After finding the minors bore the burden of proof under section 364(c) because they were the parties seeking to establish the existence of those conditions, the *Aurora P.* court next analyzed the standard of review it was to apply. It noted that while myriad cases have reviewed orders made pursuant to section 364 for substantial evidence, " 'almost all reported cases are appeals by a parent or the agency, not a child.' " (*Aurora P., supra*, 241 Cal.App.4th at p. 1156, citing among other authorities *N.S., supra*, 97 Cal.App.4th at p. 172.)

While it had "no quarrel with the use of the substantial evidence standard in those cases" (*Aurora P., supra*, 241 Cal.App.4th at p. 1156), the court in *Aurora P.* concluded a different test should apply because when the juvenile court, as trier of fact, found " 'that the party with the burden of proof did not carry the burden and that party appeals, it is misleading to characterize the failure-of-proof issue as whether substantial evidence supports the judgment. This follows because such a characterization is conceptually one that allows an attack on (1) the evidence supporting the party who had no burden of proof, and (2) the trier of fact's unassailable conclusion that the party with the burden did not prove one or more elements of the case [citations].' (*In re I.W.* (2009) 180 Cal.App.4th 1517, 1528 (*I.W.*).)" (*Aurora P.*, at p. 1156.) Because the juvenile court

37

found the minors had not meet their burden of proof, the *Aurora P.* court noted the issue on appeal was " 'whether the evidence compels a finding in favor of appellants[s] *as a matter of law*.' " (*Id.* at p. 1163, quoting *I.W.*, at p. 1528, italics added.)

The court in *Aurora P.* went on to find that the minors did not satisfy their "burden of showing error" as a matter of law (*Aurora P., supra*, 241 Cal.App.4th at p. 1164), much less under the more relaxed "substantial standard of review." (*Ibid.*) The court noted the minors ignored the evidence from the welfare agency that found "no safety concerns" and that the mother "had alleviated the conditions that led to initial assumption of jurisdiction." (*Ibid.*) The court further noted that the minors made "almost no effort" to refute the evidence supporting termination, and instead merely "direct[ed the court] to evidence in the record that might have supported a conclusion different from that reached by the juvenile court. 'Here, as in many dependency cases, the case posed evidentiary conflicts. And, as is common in many dependency cases, this case obligated the juvenile court to make highly subjective evaluations about competing, not necessarily conflicting, evidence . . . . It is not our function to retry the case. We therefore decline [the minors'] implicit invitation to review the record so as to recount evidence that supports [their] position (reargument) with the object of reevaluating the conflicting, competing evidence and revisiting the juvenile court's failure-of-proof conclusion.' (*I.W., supra*, 180 Cal.App.4th at p. 1528.) This is not a case 'where undisputed facts lead to only one conclusion.' (*Id.* at p. 1529.) [Citation.]" (*Aurora P.*, at p. 1164.) As such, the court in *Aurora P.* found the minors had failed to meet their burden on appeal. (*Ibid.*)

C. *Analysis*

Minor argues the juvenile court's finding that she failed to demonstrate conditions still existed in May 2018 that would justify the initial assumption of jurisdiction over her in August 2015 was not supported by "substantial evidence."  We conclude, however, that the test to be applied in analyzing Minor's claim of error is not whether "substantial evidence" supports the court's decision to terminate jurisdiction, but rather whether Minor—who bore the burden of proof at the contested hearing—can show by undisputed facts that the juvenile court erred as a matter of law when it terminated jurisdiction over Minor.  (See *Aurora P., supra*, 241 Cal.App.4th at p. 1164; *I.W., supra*, 180 Cal.App.4th at p. 1528.)

1. *DV Services, In-home Visits and Mother's Case Plan*

Minor argues the juvenile court erred in finding Minor did not satisfy her burden of proof under section 364(c) because "Mother did not complete the domestic violence program ordered by the court and that was prima facie evidence that conditions which would justify the initial assumption of jurisdiction still existed and continued supervision was necessary."  Minor further argues the court erred in terminating jurisdiction because Mother had failed to make Minor available "for home visits," as also required by her case plan.  We find these arguments unavailing for a variety of reasons, including our conclusion it misstates the record evidence.

As a preliminary matter, we disagree with Minor that the juvenile court ordered Mother to "complete" DV services or a program, or that Mother was somehow not compliant with her case plan because she failed to engage in such services.  We also

39

disagree with Minor that Mother failed to make Minor available to DIF to conduct welfare checks of Minor.

Indeed, the record shows Agency recommended Mother receive DV services *in Mexico* through DIF as a result of the December 30 DV incident, in which Father struck Mother in the face, causing her to suffer a "black eye." The record further shows that during the reporting period leading up to Agency's November 30, 2017 report, Mother had been "actively attempting to contact DIF on numerous occasions to receive referrals [for DV services] and to allow DIF to conduct welfare visits on Agency's behalf with [Minor]"; that Mother was clearly motivated to work with DIF after the juvenile court at the May 30, 2017 hearing, which Mother attended telephonically, expressed to Mother that, if she kept her appointments with DIF, stayed in communication and was "open and honest" with Agency, there was a "good chance that this case will be terminated at the next hearing" set for November 30; that Agency social worker Troche spoke with Mother on June 23, 30, and July 24, 2017, and Mother had reported that "she had attempted several times to contact DIF . . . to inquire about classes and case, but that [a Mexican social worker from DIS] has not called her back"; that Mother in response "reached out to PSW Troche for assistance to contact DIF to expedite . . . referrals from DIF"; that on July 31 Troche met in-person with Mother, "who continued to report that DIF has not contacted her and that she has stopped calling since they kept telling her they will have someone call her back"; that Mother again asked Agency to speak directly with DIF on her behalf about visits and welfare checks for Minor, as Mother had a four-hour commute to the consulate that was burdensome and effecting her financially; that Troche agreed he

40

would "look into DIF to conduct welfare visits"; that Mother again contacted Troche on August 30, 2017, informing him she had been late to the consulate for a visit because of car troubles, and expressing "her frustration [of] not being able to afford to travel with minor to Tijuana, Mexico and DIF not being complaint with her or seeing the minor [on] the Agency's behalf"; that after four unsuccessful attempts to reach Mother in September 2017 Troche made contact with her on September 28, 2017, who informed Troche that, after receiving a letter from DIS, she and Minor had an appointment at DIF the following day to allow the Mexican welfare agency to assess Minor to ensure "her well[-]being"; and that Troche was unable to contact Mother in late October and early November 2017.

The record also shows that Troche on July 26, 2017, reached out to social worker Sanchez, an international liaison, asking her to "follow up with DIF in regards to the status of [DIF] assisting the mother in getting into a DV program through [its] [a]gency"; that Troche on August 9 again contacted Sanchez, asking if she could follow up with DIF to set "compliance visits" in Ensenada because Mother was having "difficulty" traveling to Tijuana with Minor and to ask DIF to return Mother's calls "in regards to get[ting] enrolled in DV services"; that on August 22, Sanchez contacted Troche and reported that DIF had not provided her with any new information regarding Minor; that Troche in response informed Sanchez that Mother "continued to report that DIF has not returned her calls regarding whom her assigned [social worker] in Mexico [was], she has not been provided with DV referrals, and was wondering if DIF could conduct [a] welfare check on minor since she has been having financial difficulties traveling to the Consulate in Tijuana, Mexico"; that on September 26, Sanchez informed Troche that DIF had

41

attempted to visit Minor by leaving a "note with an appointment date" ostensibly at Mother's home; and that Sanchez on November 3 reported that DIF "has not been responsive to her and has not provided any updates" regarding Mother or Minor.

In addition, the record shows Sanchez on November 9 contacted Troche, informing him that a social worker from DIF had seen Mother and two of Mother's children, including Minor, on or about September 28, 2017, and that the "minors were doing well" in Mother's care. During this communication, Troche asked Sanchez if DIF had conducted a welfare check on Minor in October. Sanchez reported that DIF had not provided her with this information and that a social worker from DIF was in the process of preparing a report, which would be forwarded to Sanchez when completed. Sanchez also informed Troche that an attorney had been assigned to Mother's DV case, but it was "*uncertain* if [DIF had] provided referrals" to Mother. (Italics added.)

Agency in its November 30 status review report further noted that Minor was an "adorable, active and affectionate toddler," who appeared to be "close to her mother, as evidenced by her smiling and laughing while running around the room taking pictures with the mother's phone and showing them to her"; that minor was attending preschool in Ensenada; that, although Mother was concerned Minor sometimes reached out to strangers, Minor then was not participating in mental health services; that Mother continued to utilize the parenting skills she learned through services with Agency, as well as the skills she learned in her individual therapy, including not looking to the past, but instead into the future and setting goals; that one of Mother's goals was to gain employment, which she had found; that during this reporting period, Mother did not

42

participate in any additional services because Mother had "*successfully completed them during the prior reporting period*" (italics added); and that Troche, who had been assigned to the case for more than two years, "*strongly* believe[d] that the mother has been able to positively display an appropriately positive, safe, loving environment to the minor" (italics added), and that he "believe[d] that the mother has displayed that the initial safety threat of neglect [that led to dependency was] no longer present and that the mother has gained the knowledge to prevent any future incident[s] that would put [Minor] or her other children at risk."

Thus, as the foregoing summary shows, the record in no way supports Minor's argument that the court erred in terminating jurisdiction because Mother (allegedly) did not complete DV services or a program "ordered" by the court, or because Mother failed or refused to make Minor available to DIF for welfare checks.

Minor's argument also ignores the evidence in the record that Mother was told by DIF social workers that she was not in need of any additional services, including for DV, as a result of the December 30 incident with Father. Agency's May 30 addendum report prepared in connection with the 18-month review hearing noted Mother on April 18, 2017, represented to social worker Troche that DIF had not asked Mother to attend a second meeting as a result of the DV incident and that DIF had "not reached out to her." Troche reported that Mother on April 27 represented she had met with a DIF social worker the day before and that DIF "told her they had 'no concerns' " regarding Mother and that DIF would provide Agency with a letter expressing this view. Although no such letter appears in the record, as noted *ante* by Troche, Sanchez, the juvenile court, and

43

counsel of the parties including for Minor, it was difficult to obtain information from DIF, and when such information was received, it was often months old.

Moreover, the record shows that by May 30, 2017, Mother had left Father because of the DV incident and because he had been very inconsistent with services. Mother also reported to Troche during a May 25 scheduled visit with Minor at the Mexican consulate that she had not seen Father for two months; that she did not disclose to Father where she and the children, including Minor, were living, as she had moved to Tijuana; that Mother made myriad attempts to get services in Tijuana instead of Ensenada, but was unsuccessful in having her case transferred; that Mother therefore decided to move back to Ensenada to be closer to maternal grandmother and to "clear and complete any services DIF needs her to complete to close [her] case"; and that she intended on moving with the children, including Minor, to Puebla, Mexico, to live with maternal grandfather, who was about to retire and who agreed to assist Mother financially, which fact maternal grandmother confirmed.

While it is true that the juvenile court in November 2017—and throughout early 2018, when the case was repeatedly continued at the request of Minor's counsel—had no additional information regarding whether Father and Mother had reunited, there also is no evidence in the record to support such a finding, as the juvenile court noted during the May 23 contested hearing, when it refused the request of Minor's counsel to engage in speculation and assume Mother and Father were back together.

Finally, the record shows that, during the reporting period leading up to Agency's November 30 report, Mother had been taking care of Minor since December 2016, who

44

also lived with her two sisters; that following the December 30 DV incident, Mother did not speak to or see Father until January 20, 2017, when he asked Mother for " 'forgiveness' "; that Father stayed with Mother and the children, including Minor, for about *three days* in February 2017 helping Mother with her business; that after DIF on February 20 ordered Father to leave the family home while it assessed the family, Mother and the children, including Minor, lived with a friend "for several days" to avoid Father; and that thereafter, Mother had little or no contact with Father, and was unaware of his whereabouts during the critical reporting period leading up to Agency's November 2017 recommendation that jurisdiction be terminated.

Minor's arguments that Mother was "ordered" to participate in DV services or a program, or that Mother and Father had reunited, or that there was an ongoing concern about a reoccurrence of DV between them, or that Mother did not make Minor available for welfare checks, fail as a matter of law (and would fail even if we applied the more "relaxed" substantial evidence standard of review). (See *Aurora P., supra*, 241 Cal.App.4th at p. 1164; *I.W., supra*, 180 Cal.App.4th at p. 1528.)

2. *Employment and Mother's Case Plan*

Minor next argues the court erred in terminating jurisdiction because when it did so, there allegedly was no "current evidence Mother had maintained employment," which was "required in her initial case plan due to Mother's arrest for drug trafficking." We also find this argument unavailing.

The record shows during the reporting period leading up to Agency's November 30 report, Mother stated she was employed as an Uber driver, which gave Mother the

flexibility she needed to raise her children, including Minor. Thus, at the time Agency recommended termination of jurisdiction, Mother was employed.

The record further shows that throughout dependency, other than when Mother was caring for her newborn in early July 2016, Mother maintained employment, including working in grocery and convenience stores, at a car wash, and opening her own business creating fruit bouquets. The record also shows Mother received financial assistance from maternal grandmother, who also provided Mother with "housing" and "child care."

In addition, at *no* point during this nearly three-year dependency did Agency, or Minor, claim that Mother was failing to adhere to her case plan by not being employed, (or by not making Minor available for home visits, as discussed *ante*). As noted, the record shows when Minor's counsel repeatedly sought a continuance of the review hearing, her "only" concern about terminating jurisdiction stemmed from the December 30 DV incident, and whether Mother had received services from DIF in connection with that incident, and *not* as a result of Mother's employment situation (or her alleged failure to make Minor available for in-home visits), as Minor now argues for the first time on appeal.[10]

In any event, Minor cannot show as a matter of law, much less under the more "relaxed" substantial evidence standard of review, that the court erred in terminating

---

10    Because we exercise our discretion and reach the merits of these issues, we need not decide whether Minor forfeited these claims of error by not raising them in the trial court.

46

jurisdiction under section 364(c) as a result of Mother's (alleged) lack of compliance with Agency's case plan due to employment. (See *Aurora P., supra*, 241 Cal.App.4th at p. 1164; *I.W., supra*, 180 Cal.App.4th at p. 1528.)

3. *Mother's Contacts and Communication with Agency and the Difficulties She and Minor Experienced in Obtaining Cross-border Services from DIF*

Minor also faults the juvenile court's decision to terminate jurisdiction on the basis that Mother failed to follow court orders, including by failing to appear telephonically at the November 30 review hearing, and by failing to remain in contact with Agency. Minor on appeal specifically argues the court was "justified" in retaining supervision, ostensibly until Minor is found, because Mother "disappeared" with Minor and "stonewall[ed]" the juvenile court from having access to Minor after September 28, when Mother appeared with two of her children, including Minor, at DIF, who then found Minor was "doing well" in Mother's care, as reported to Agency in early November 2017. We reject this argument for several reasons.

The record shows throughout this lengthy dependency, Agency experienced difficulties in managing the placement of Minor in Mexico, and overseeing the provision of services to parents through DIF. As already discussed in detail *ante*, in the months leading up to Agency's November 30 report recommending termination of jurisdiction, Mother made myriad unsuccessful attempts to work with DIF regarding her case. Agency social worker Troche noted in November 2017 that Mother (understandably) had become increasingly frustrated with DIF, as she was raising three children, including Minor, without any financial support from Father; she was unable to cross the border into

47

the United States to obtain any services she *might* need to close the case; she seemingly was unable to obtain those services in Mexico; and for about a year-and-a-half, she had been taking care of Minor and Minor's two sisters, who were reported to be doing well under her care and supervision as late as September 28, 2017, or two months before Agency made its recommendation to terminate jurisdiction.

The record also shows the juvenile court was concerned for the welfare of Minor, as it continued the case multiple times to allow DIF to try and locate Minor to make sure she and "mom were doing okay" before terminating jurisdiction. Of course, the more times the court continued the hearing, the more outdated the information about Minor became, which Minor's counsel also recognized when she noted the possibility that all concerned might "be stuck in the same situation continually" if the case was repeatedly continued. Despite that recognition, Minor's counsel wanted the court to continue its jurisdiction until Minor was found.

In our view, Minor's counsel's request to continue the case—ostensibly in perpetuity—ignores the realities presented by this factually unique case. Clearly, neither the juvenile court nor Agency has jurisdiction in Mexico. Agency repeatedly recognized it depended on DIF for information about Minor, making the resolution of this dependency "slower" than most others. It also appears equally clear through DIF's lack of responsiveness to Mother, Sanchez, and Agency, that it no longer believed its assistance was needed, as DIF repeatedly refused Mother's request for help—and was less than forthcoming with information about Minor—in the months leading up to Agency's November 30 report, when it recommended jurisdiction be terminated.

48

Minor's counsel's request to continue the case until Minor is found also ignores the question of what exactly the juvenile court and/or Agency could do, if anything, if and when Minor was located, particularly if Minor was found in Mexico, perhaps in Puebla, Mexico, living with Mother, her sisters, and maternal grandfather, as Mother had planned and as confirmed by maternal grandmother. Would Agency seek to have Minor removed from Mother, even if Minor was then thriving in her care, because Mother had stopped communicating with Agency after she (understandably) had become frustrated by the lack of cooperation she was receiving from DIF in attempting to complete services in Ensenada in order to end Minor's dependency in the United States?

Our respected colleague in dissent faults Agency for not searching for Mother, Minor, or grandmother in the United States before the court terminated its jurisdiction. Although Mother stated one of her long-term goals was someday to resume living with her children in the United States, we note that throughout this lengthy dependency, Mother made no attempt to return to the United States, including when she was having difficulty obtaining services for herself and Minor in Mexico in order to close dependency. Nor could she cross the border into the United States, given her August 2015 arrest and detention for transporting a large amount of marijuana across the international border. Instead, the record shows Mother intended to move with her children, including Minor, to Puebla, Mexico, to live with paternal grandfather, who could provide Mother and her children with much-needed support, including financial assistance.

49

With respect to grandmother, the record shows that, at the time Agency was recommending termination of jurisdiction, she no longer was communicating with Agency; her phone line had been disconnected; she had not cared for Minor since December 2016; and her relationship with Mother had appeared to sour. Under these circumstances, we do not believe termination of jurisdiction over Minor was conditioned on Agency conducting a "standard search" for Mother, Minor, or grandmother in the United States.

Of course, if Minor someday is located, depending on the circumstances Agency may be able to file a new petition if Minor is found to be a person coming within section 300. However, until that time, if ever, we conclude the juvenile court properly rejected the request of Minor's counsel that it retain jurisdiction over Minor pursuant to section 364(c) and conduct a review hearing every six months until Minor is found.

4. *Caselaw Relied on by Minor Is Inapplicable in this Factually-unique Cross-border Case*

Minor on appeal relies on many of the same cases cited by her counsel at the contested May 23 hearing. Like the juvenile court, we find none of these decisions inform our analysis on this issue.

Minor cites to in *In re Claudia S.* (2005) 131 Cal.App.4th 236 (*Claudia S.*). The issue in *Claudia S.* was not whether the court should retain jurisdiction under section 364(c), but rather whether the juvenile court erred when it conducted myriad hearings after the initial detention hearing, and made numerous "findings and orders at the review hearings," without any information whatsoever regarding the dependent

50

children, who had left with the mother to go to Mexico so that the mother could take care of her own ailing mother. We held in *Claudia S.* that the juvenile court violated the parents' due process rights when it conducted multiple dependency hearings in their absence and without appointing them counsel. (*Id.* at p. 249.)

The facts of *Claudia S.* are clearly much different than those in the instant case, where the juvenile court and Agency had at their disposal substantial information gathered over the course of years showing Mother had completed all services initially requested by Agency; Minor, who was returned to her in December 2016 was thriving in her care; and Agency social worker Troche—who had been assigned to Minor's case for more than two years—"strongly believe[d] that the mother has been able to positively display an appropriately positive, safe, loving environment to the minor . . . and that mother has gained the knowledge to prevent any future incident that would put [Minor] and her other children at risk."

Minor also relies on *In re Jean B.* (2000) 84 Cal.App.4th 1443 (*Jean B.*), a case also not involving section 364(c). In that case, the dependent child was placed with the mother, but was abducted by the father about a month later. Three years later, the juvenile court entered an order terminating jurisdiction while the child and the father remained at large. The *Jean B.* court ruled the court erred in terminating jurisdiction and recalling the warrants for the father's arrest because it "left an at-risk child in the custody of a father who had a history of drug abuse." (*Id.* at p. 1446.)

Unlike the father in *Jean B.* who abducted the dependent child and remained at large when the court attempted to terminate its jurisdiction, the record in the instant case

51

shows the juvenile court returned Minor to the care of Mother based on Agency's recommendation, after Mother made substantial progress in services in Mexico ordered and overseen by the court and Agency. Also unlike the facts of *Jean B.*, as already noted the court and Agency had at their disposal in the instant case substantial information—up to two months before Agency recommended termination of jurisdiction—showing Minor was thriving in the care of Mother, who had continuously provided a "positive, safe, [and] loving environment" for Minor. Quite simply, the instant case does not involve a situation where one parent abducts a dependent child placed with another parent.

Minor also relies on the case of *In re Baby Boy M.* (2006) 141 Cal.App.4th 588 (*Baby Boy*). In that case, two days after giving birth the mother handed over her child to the child's biological father at a train station. The mother gave up the child to avoid having him placed under the jurisdiction of the welfare agency, who already had filed petitions on behalf of the mother's other children based on the risk of harm posed by physical abuse, after one of those children had been admitted to the hospital with "multiple fractures—from one to six weeks old—that were consistent with physical abuse" (*id.* at p. 592), and another had died, also from abuse (*id.* at p. 593). After handing off the newborn to his father, the mother in *Baby Boy* initially lied about the child's birth, and thereafter denied knowing the whereabouts of the father, whom she identified as "James Smith" from Atlanta, and whom she had met on the "streets." (*Id.* at p. 594.)

The *Baby Boy* court found the court erred in conducting the jurisdiction and disposition hearing because there were insufficient facts to establish whether California

had subject matter jurisdiction over the child.  (*Baby Boy, supra*, 141 Cal.App.4th at p. 599.)  The court in *Baby Boy* also found error based on "prudential considerations independent of the jurisdictional analysis," as the juvenile court "lack[ed] *any* meaningful information concerning" the child.  (*Id.* at pp. 600-601, italics added.)  Clearly, the facts of *Baby Boy* and the court's holding therein have little to do with the instant case.

In sum, we conclude Minor did not satisfy her burden of proof under section 364(c) to show conditions still existed that would have justified the initial assumption of jurisdiction over her under section 300.  As such, the juvenile court's order terminating jurisdiction was proper.[11]

II

*MINOR WAS NOT DEPRIVED OF HER STATUTORY RIGHT TO COUNSEL*

Minor next argues the juvenile court violated her statutory right to counsel pursuant to section 317, subdivision (e)(2)[12] because at the time of the May 23 contested hearing, Minor had celebrated her birthday just nine days earlier and thus, counsel was required to interview Minor and determine her "wishes," "assess the child's well-being,

___

[11]    In light of our decision that termination of jurisdiction was proper, we conclude it is unnecessary to address whether the court erred in refusing pursuant to section 352, subdivision (a)(1) to continue (yet again) the family maintenance review hearing.

[12]    Section 317 concerns appointment of counsel in a dependency proceeding. Subdivision (e)(2) of this statute provides as follows:  "If the child is four years of age or older, counsel shall interview the child to determine the child's wishes and assess the child's well-being, and shall advise the court of the child's wishes.  Counsel shall not advocate for the return of the child if, to the best of his or her knowledge, return of the child conflicts with the protection and safety of the child."

53

and shall advise the court of the child's wishes." (*Ibid.*) We find this argument unavailing.

First, Minor failed to raise this issue at the May 23 contested hearing. "A party forfeits the right to claim error as grounds for reversal on appeal when he or she fails to raise the objection in the trial court. [Citations.] Forfeiture, also referred to as 'waiver,' applies in juvenile dependency litigation and is intended to prevent a party from standing by silently until the conclusion of the proceedings." (*In re Dakota H.* (2005) 132 Cal.App.4th 212, 221.) Thus, a party may not assert theories on appeal which were not raised in the trial court. (*Fretland v. County of Humboldt* (1999) 69 Cal.App.4th 1478, 1489.)

Second, the record shows Minor was in fact represented by counsel at the contested May 23 hearing, and at all other dependency hearings up to that point, including those that Minor's counsel had successfully continued (before Minor turned four years old). As noted *ante*, the record also shows Minor's counsel was a strong advocate for Minor, including at the May 23 hearing, when counsel in Minor's absence presented evidence, called witnesses, and aggressively argued in closing that the court should continue dependency jurisdiction until Minor was found.

Thus, we conclude even if the issue was not forfeited, Minor was neither deprived of her right to counsel nor deprived of the protections afforded her under section 317. (See § 317, subd. (c)(1) & (2) [generally noting the court shall appoint counsel for a child in dependency and noting that the "primary responsibility" of appointed counsel "shall be to advocate for the protection, safety, and physical and emotional well-being of the

54

child"].)

Finally, even if Minor was somehow deprived of some of the benefits afforded her under section 317, subdivision (e)(2) because she was unable to express her "wishes" to counsel and counsel was unable to "assess" Minor at the May 23 contested hearing, we conclude any such deprivation was harmless. (See *In re Candida S.* (1992) 7 Cal.App.4th 1240, 1252 (*Candida S.*) [noting "that the right to independent counsel in dependency cases is purely statutory, not of constitutional dimension, and subject to harmless error analysis upon review"].)

As noted, Minor turned four years old just nine days before the May 23 hearing, thus triggering the protections afforded by subdivision (e)(2) of section 317. However, in light of Minor's tender age and all reports that she was thriving in Mother's care while living with her two sisters, it seems very unlikely Minor's "wishes" would have been anything other than to continue in her current living arrangement, as the record shows Minor was "happy" with, and very bonded to, Mother. We thus conclude any error by the court in failing to consider Minor's "wishes" before terminating jurisdiction was harmless. (See *Candida S., supra*, 7 Cal.App.4th at p. 1252.)

Regarding assessing Minor pursuant to subdivision (e)(2) of section 317, all agree, including this court, that the preference would have been to ensure Minor's well-being in May 2018 before the juvenile court terminated jurisdiction. In fact, it was precisely for this reason that the court continued the review hearing multiple times, at one point imploring Agency to instruct DIF it needed to make the instant case a "priority" to "verify mom and the minor were okay."

55

However, we conclude under the unique facts of the instant case that any error by the court in not allowing counsel, as opposed to DIF, Agency and/or the juvenile court, to "assess" minor's well-being in May 2018, despite multiple continuances of the review hearing, was harmless because Minor was not then available for assessment and because *all* reports regarding Minor showed she was thriving in the care of Mother.

DISPOSITION

The order terminating jurisdiction over Minor pursuant to section 364(c) is affirmed.

BENKE, Acting P. J.

I CONCUR:


IRION, J.

DATO, J., Dissenting.

I fully appreciate the significant challenges faced by both the Agency and the juvenile court in this cross-border dependency matter. And I understand the majority's reluctance to say that the court abused its discretion when it denied any further continuance and terminated jurisdiction. But in the fall of 2017 after the Agency completely lost contact with Mother and the child, the juvenile court on two occasions continued the scheduled family maintenance review hearing, quite properly recognizing that it needed more current information before deciding whether to terminate jurisdiction. "[I]f we can just verify [Minor] and [Mother] are okay. [¶] I think we can comfortably close this case out."

Unfortunately, the continuances yielded no additional information. At that point, the court essentially took the position that it could not continue the matter indefinitely, conducted the review hearing with stale information, and terminated jurisdiction. In my view, the primary problem with this approach is that the evidence at the review hearing revealed two relatively simple straightforward steps the Agency admitted it could have taken but did not take to locate Mother and the Minor.

To place these two steps in proper context, it is necessary to focus on the period between May and September, 2017. Prior to May, Mother and Minor were living in Tijuana, Mexico. But in a meeting with Agency social worker Alexis Troche on May 25 at the Mexican consulate, Mother reported she had decided to move back to Ensenada, Mexico to live with the maternal grandmother (Grandmother). Troche testified that May

2017 was the last time Minor was seen in her home. He added that he personally confirmed Mother and Minor were then living with Grandmother.

On one level Mother's move back to Ensenada is hardly surprising. Since early in the case, Grandmother was Mother's primary source of support, both psychological and financial. But at the same time, Mother reported that Grandmother planned to move to the United States in mid-July before Grandmother's son (Mother's brother) started high school. The question no one thought to ask, apparently, was what Mother planned to do then?

Four months later—September 2017—was the last contact with Mother, when she presented herself at the DIF offices in Ensenada after three unsuccessful attempts by DIF to conduct a home visit. At that September 29, 2017 meeting, Mother confirmed that Grandmother had recently moved to the United States. Even though (1) Mother's last-known residence was living with Grandmother in Ensenada, (2) Grandmother was always Mother's primary support, and (3) it had been told Grandmother moved to this country in July, the Agency never explained why it made no effort to search for Grandmother and her son in the United States when it lost all contact with Mother shortly after the September 29 meeting.

In addition, at the same September 29 meeting with DIF, Mother reported that she was "attempting to complete documents so she can move back to the United States." The Agency knew that Mother had previously lived in California, and it had an established procedure for locating minors and parents in the United States. Yet at the May 2018

2

maintenance review hearing, social worker Troche confirmed that the Agency had conducted no such search for Mother and Minor after it lost contact with them.

Thus, by October 2017 the Agency had reliable information that Grandmother *had moved* and Mother and Minor *might be moving* to the United States. Had it conducted a standard search for Grandmother, Mother and Minor in the United States and come up empty, this would be a different case. But because the Agency failed to pursue these two simple reasonable steps, at the same time offering no explanation for its failure to do so, I believe the juvenile court abused its discretion when it denied Minor's counsel's further request for a continuance at the close of the maintenance review hearing and instead terminated jurisdiction.

DATO, J.