Filed 5/26/21  In re M.S. CA2/4

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(a). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115(a).

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA
### SECOND APPELLATE DISTRICT
### DIVISION FOUR

| | |
|---|---|
| In re M.S., Person Coming Under the Juvenile Court Law. | B308078 |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, Plaintiff and Respondent, v. L.C., Defendant and Appellant. | Los Angeles County Super. Ct. No. 19CCJP03438 |

APPEAL from an order of the Superior Court of Los Angeles County, Brett Bianco, Judge. Affirmed.

Leslie A. Barry, under appointment by the Court of Appeal, for Defendant and Appellant.

Rodrigo A. Castro-Silva, County Counsel, Kim Nemoy, Assistant County Counsel, Navid Nakhjavani, Principal Deputy County Counsel, for Plaintiff and Respondent.

1

# INTRODUCTION

The juvenile court exercised jurisdiction over M.S., the daughter of L.C. (mother) and G.S. (father),[1] under Welfare and Institutions Code[2] section 300, subdivisions (b) and (c). The court found: (1) M.S. was at substantial risk of serious physical harm due to father's interference with her mental health services; and (2) M.S. was at substantial risk of serious emotional damage due to father making repeated allegations that M.S. had been abused in mother's care, and subjecting her to numerous interviews and examinations by social workers, medical providers, and police officers. M.S. was placed with her parents, who were ordered to participate in family maintenance services.

At the twelve-month status review hearing, the juvenile court found the circumstances justifying the initial assumption of jurisdiction no longer existed and were not likely to exist if supervision was withdrawn. Thus, it terminated jurisdiction and issued a juvenile custody order granting the parents joint legal and physical custody with M.S. primarily living with father.

On appeal, mother contends the juvenile court erred by terminating jurisdiction. Specifically, she argues: (1) per section 364, subdivision (c), father's failure to complete court-ordered services is prima facie evidence that continued supervision is necessary; and (2) the record does not contain any evidence to rebut that evidentiary presumption. We disagree and affirm.

---

1   Father is not a party to this appeal.

2   All undesignated statutory references are to the Welfare and Institutions Code.

# BACKGROUND

Mother and father have one child together, M.S., who was born in January 2007. The parents separated in 2009 and do not live together. Per a family court order entered in February 2018, they shared 50/50 joint legal and physical custody of M.S., with M.S. primarily residing with mother subject to visitation by father.

Prior to the initiation of the dependency case giving rise to this appeal, between June 2013 and March 2019, the Department of Children and Family Services (Department) received eight referrals alleging M.S. had been abused while in mother's care. The Department's investigations into all but one of the referrals resulted in a determination that the allegations were either "inconclusive" or "unfounded." The sole referral containing "substantiated" allegations of abuse resulted in the Department filing a petition on behalf of M.S. in 2015, which was dismissed in December 2016.

In May 2019, M.S. was interviewed at LAC + USC Medical Center's Child Abuse and Neglect Clinic based on "numerous allegations from her father of ongoing abuse during the time that she spends with her mother." During the interview, M.S. reported: (1) mother and her boyfriend (step-father) argued frequently and screamed at one another, and that she was afraid their disputes "will turn physical"; and (2) mother makes her feel unloved and sad by calling her demeaning names. M.S.'s report prompted a referral to the Department.

During the Department's investigation, M.S. reported she was tired of being involved with the juvenile court and being interviewed by social workers, therapists, and police officers. She

related she "fe[lt] uncomfortable when so many [of those] people come talk to [her]," and was confused about why social workers were frequently checking on her. M.S. further reported that she felt angry, depressed, frustrated, sad, and scared when "[these] people come talk to [her.]" According to M.S., these feelings have driven her to engage in self-harm; she stated she bites her lip when police officers or social workers come to speak with her, and that she has cut herself on the arm with a paperclip.

Mother reported that per a family court order, she enrolled M.S. in therapy on several occasions with different providers. Father, however, terminated services each time because he disapproved of the therapists.

At the adjudication hearing held in July 2019, the juvenile court sustained the section 300 petition the Department filed on M.S.'s behalf, as amended by interlineation.[3] In so doing, the court found the following allegations to be true: (1) M.S. was at risk of serious physical harm due to father's "medical neglect," in that father "has terminated [her] mental health treatment with mental health providers on numerous occasions" despite her "ha[ving] mental and emotional problems, including a diagnosis of anxiety, depression, suicidal ideations and self-harming behaviors"; and (2) M.S. was at risk of serious emotional damage due to father's "emotional abuse," in that throughout the parents' "ongoing custody dispute," father "ma[de] continuing accusations that . . . mother [was] abusing and neglecting [M.S.]" and has

---

3    The court struck from the petition the allegations asserting mother had emotionally abused M.S. through her involvement in the parents' custody dispute, finding they were not supported by sufficient evidence. By this amendment, mother was rendered a non-offending parent.

"subjected [M.S.] to numerous interviews with medical providers, social workers, mental health providers and law enforcement officers on numerous occasions," which have caused M.S. to "exhibit[ ] self-harming behaviors[.]"

The juvenile court declared M.S. a dependent of the court under section 300, subdivisions (b) and (c), placed M.S. with her parents under Department supervision, and ordered the parents to attend mediation to determine a custody arrangement that would meet M.S.'s needs. The parents' case plans required them to participate in individual counseling, conjoint counseling with M.S. when recommended by her therapist, and a co-parenting program. The juvenile court further ordered father to submit to a psychological evaluation under Evidence Code section 730, and ordered father not to interfere in M.S.'s relationship with her current therapist or terminate services with the therapist.

In July 2019, M.S. reported she had used a pen to make scratch marks on her forearm twice in one week in response to mother calling her names. Consequently, in August 2019, M.S. was enrolled in Wraparound Services at her therapist's recommendation, as those services were "more intensive" and "appropriate for [M.S.] due to ongoing concerns of self-harming behavior and ongoing visitation/custody issues." Later that month, M.S. was hospitalized for four days after refusing to visit with mother and stating "she would rather 'die than go with her mother[.]'" Following her discharge, father and mother agreed to a safety plan by which M.S. would reside with father until their scheduled mediation.

In September 2019, the parents attended mediation as ordered by the juvenile court and agreed to a parenting plan. Under this plan, they agreed that in light of her wishes not to

5

reside with mother, M.S. would live primarily with father, and mother would temporarily waive her parental time while she and M.S. participated in services to address their issues. They also agreed to: (1) refrain from making negative comments about one another or their friends and family within earshot of M.S.; (2) return to mediation to create a parenting plan as needed at the discretion of the juvenile court or the mental health professionals involved in the case; and (3) consider M.S.'s safety, welfare, best interests, and wishes.

In January 2020, father participated in a psychological evaluation by Dr. Alfredo E. Crespo. In his report, Dr. Crespo opined father "has been persistent and quite dramatic in advocating for the protection of his daughter in the mother's home," and has engaged in "relentless, odd, [and] obstinate efforts to prove that [M.S.] was being abused in her mother's care — without much apparent recognition of the negative emotional impact [his actions] ha[ve] had on his vulnerable daughter." Based largely on those observations, he concluded "father poses a risk of emotional harm to [M.S.]" He noted father "may benefit from individual counseling" and "a Spanish-speaking group for parents in high-conflict divorces" to gain insight on how his actions have negatively affected M.S. and contributed to her estranged relationship with mother.

After making significant improvements in her mental health issues, M.S. was transitioned from Wraparound Services to community-based therapy in December 2019.

At the six-month status review hearing held in January 2020, the Department noted its status review report had recommended termination of jurisdiction in light of M.S.'s progress, but acknowledged it had received Dr. Crespo's report

6

after making its recommendation. M.S.'s counsel and counsel for both parents argued the case should remain open. The juvenile court rejected the Department's recommendation. Instead, it found continued supervision was necessary to ensure the family addressed the issues initially giving rise to jurisdiction, and ordered the parties to participate in further family maintenance services.

Between January 2020 and the twelve-month status review hearing held in September 2020,[4] M.S. continued to reside with father. She reported feeling happy and safe in his care and did not exhibit any signs of neglect, abuse, or self-harm. M.S. continued to indicate she did not want to see mother, and did not want to discuss visiting her or attending conjoint therapy with her "because she feels as though she is being pressured and it causes her anxiety." She participated in individual therapy and family therapy with father. While mother indicated she wanted to see M.S., she was "cooperative [with] and understanding [of]" M.S.'s needs, and did not have contact with M.S. at her request to avoid causing her further anxiety.

At the twelve-month status review hearing, the Department again recommended termination of jurisdiction, emphasizing it did not "believe that there [were] any safety risks with the family" and "that the situation has stabilized." M.S.'s counsel and father's counsel agreed with the Department. By contrast, relying on Dr. Crespo's report, mother's counsel argued M.S. was still at risk of emotional abuse by father, as he was "still displaying the type of behavior that led to the filing of [the]

_____

4      At the agreement of counsel for all of the parties, the twelve-month status review hearing originally scheduled for July 2020 was continued to September 2020.

petition" and had yet to participate in individual counseling or complete a co-parenting program as required by his case plan. Mother's counsel did not offer any new evidence in support of this position.

The juvenile court found the conditions justifying the initial assumption of jurisdiction under section 300 no longer existed and were not likely to exist if supervision was withdrawn. In rendering its finding, the court noted that although it "agree[d] with Dr. Crespo's recommendation" regarding the potential benefit father might derive from therapy and a parenting group, "things have stabilized" in the months following his evaluation of father. Accordingly, the court terminated jurisdiction and issued a juvenile custody order granting the parents joint legal and physical custody, with M.S. primarily residing with father.

Mother timely appealed.

## DISCUSSION

## I.    Applicable Principles and Standard of Review

Section 364 applies where, as here, "an order is made placing a child under the supervision of the juvenile court pursuant to Section 300 and in which the child is not removed from the physical custody of his or her parent or guardian[.]" (§ 364, subd. (a).) Under this statute, the juvenile court must "review[ ] the status of the case every six months . . . ; under such review, the court is not concerned with reunification, but in determining 'whether the dependency should be terminated or whether further supervision is necessary.' [Citations.]" (*In re Pedro Z.* (2010) 190 Cal.App.4th 12, 20.) "The juvenile court

8

makes this determination 'based on the totality of the evidence before it.' [Citation.]" (*In re Aurora P.* (2015) 241 Cal.App.4th 1142, 1155 (*Aurora P.*).).)

Section 364, subdivision (c) "establishes a 'statutory presumption in favor of terminating jurisdiction and returning the children to the parents' care without court supervision.' [Citation.]" (*Aurora P., supra*, 241 Cal.App.4th at p. 1155.) This statutory provision states: "After hearing any evidence presented by the social worker, the parent, the guardian, or the child, the court shall determine whether continued supervision is necessary. The court *shall terminate* its jurisdiction *unless* the social worker or [the Department] establishes by a preponderance of evidence that the conditions still exist which would justify initial assumption of jurisdiction under Section 300, or that those conditions are likely to exist if supervision is withdrawn. Failure of the parent or guardian to participate regularly in any court ordered treatment program shall constitute prima facie evidence that the conditions which justified initial assumption of jurisdiction still exist and that continued supervision is necessary." (§ 364, subd. (c), italics added.)

"Where, as here, the social services agency recommends termination of jurisdiction, termination will be the 'default result' unless either the parent, the guardian, or the child objects and establishes by a preponderance of the evidence that conditions justifying retention of jurisdiction exist or are likely to exist if supervision is withdrawn. [Citation.]" (*Aurora P., supra*, 241 Cal.App.4th at p. 1163.) Put differently, the party "seeking to persuade the juvenile court to do something other than follow the statutory presumption favoring termination of jurisdiction . . . [bears] the burden to establish the existence of

9

conditions justifying retention of dependency jurisdiction. [Citation.]" (*Ibid.*)

"The substantial evidence standard of review applies in the usual case in which the social services agency *opposes* termination of jurisdiction[.]" (*Aurora P.*, *supra*, 241 Cal.App.4th at p. 1156, italics added.) A "different test," however, applies where the agency *recommends* termination of jurisdiction, and the juvenile court finds that the party bearing the burden of proving the existence of conditions justifying further supervision failed to meet that burden. (*In re N.O.* (2019) 31 Cal.App.5th 899, 925 (*N.O*).) In the latter situation, "the question is 'whether the evidence compels a finding in favor of the appellant[s] as a matter of law.' [Citation.]" (*Aurora P.*, *supra*, 241 Cal.App.4th at p. 1163; see also *N.O.*, *supra*, 31 Cal.App.5th at p. 926 ["[T]he test to be applied is . . . whether . . . [the appellant] can show by undisputed facts that the juvenile court erred as a matter of law when it terminated [dependency] jurisdiction . . . . [Citations.]"].)

## II.   Analysis

Mother contends the juvenile court erred by terminating jurisdiction. In support of this position, she argues father's failure to complete court-ordered services—specifically, his failure to participate in individual counseling and complete a parenting program—"constituted prima facie evidence that continued supervision was necessary" under section 364, subdivision (c), which "was not rebutted" by any evidence in the record. Mother contends the record reflects supervision is still necessary because it demonstrates: (1) Dr. Crespo opined father poses a risk of emotional harm to M.S. because he does not understand how his

10

attempts to prove she had been abused while in mother's care negatively impacted her; (2) father continued to engage in the problematic behaviors giving rise to dependency, as he continued to express concerns about M.S.'s safety in mother's care based on prior allegations of abuse and demanded reinvestigation of those allegations; and (3) M.S. "recognized that continued juvenile court intervention was necessary when she asked to be able to see 'a specialist who [could] find something better for [her]'" at the twelve-month status review hearing.

As mother correctly points out, the record reflects father did not enroll in individual counseling or complete a co-parenting program, and therefore did not participate regularly in all of the services ordered by the juvenile court. By operation of section 364, subdivision (c), father's non-compliance with his case plan establishes a rebuttable presumption that "the conditions which justified initial assumption of jurisdiction still exist and that continued supervision is necessary." (§ 364, subd. (c); Evid. Code § 602 ["A statute providing that a fact or group of facts is prima facie evidence of another fact establishes a rebuttable presumption."].) As discussed below, however, the evidence presented was sufficient to rebut this presumption with respect to each of the grounds on which the court assumed jurisdiction. We therefore conclude that, under either the substantial evidence standard or the heightened standard articulated in *Aurora P.*, *supra*, 241 Cal.App.4th at p. 1163 and *N.O.*, *supra*, 31 Cal.App.5th at p. 926, mother has not shown the order terminating jurisdiction must be reversed. (See *Aurora P.*, *supra*, 241 Cal.App.4th at p. 1164 [minors' failure to carry their burden under the substantial evidence standard "necessarily" demonstrated their inability to satisfy the heightened standard].)

11

## A. Jurisdiction Under Section 300, Subdivision (b)

As noted above, the juvenile court exercised jurisdiction over M.S. under section 300, subdivision (b) based on father's interference with her mental health treatment, finding his repeated cancellation of services with her therapists constituted "medical neglect" of her "mental and emotional problems," which placed her at risk of serious physical harm. For the reasons discussed below, we conclude the evidence is sufficient to rebut the presumption that, given father's failure to participate regularly in court-ordered services, these circumstances still existed at the time of the twelve-month status review hearing.

First, the record reflects M.S. consistently received mental health services, and father did not interfere with those services even though he occasionally had concerns about them, while she was a dependent of the court. Following the juvenile court's dispositional order in July 2019, M.S. participated in individual therapy until August 2019, when she was transitioned to Wraparound Services. Initially, father was concerned about the transition, and did not want her services to change absent court order, because he wanted to ensure she stayed in therapy and maintained a relationship with her therapist as required by the court's dispositional order. Ultimately, however, he did "not express [ ] any resistance" to the transition after speaking to M.S.'s therapist at the time.

Between August 2019 and early November 2019, the Wraparound Team "work[ed] with [both parents] to . . . support M.S.'s progress, emotional health and wellbeing." Later on in November 2019, the Wraparound Team determined M.S. no longer needed intensive services and recommended her transfer

12

to community-based therapy. A month later, M.S. was "linked . . . to a community based therapist through Victims of Crime, per father's request." With this therapist, M.S. engaged in individual therapy and family therapy with father up through the termination of jurisdiction. In its final status review report, the Department stated father ensured M.S.'s psychological needs were being met, and has been "consistent in ensuring [she] continues receiving services."

Next, the record establishes that as a result of receiving consistent treatment while her dependency case was open, M.S. has made significant progress in terms of her mental health. M.S. has not engaged in self-harm or expressed a desire to self-harm since July 2019. In December 2019, she reported feeling less anxious, and reported engaging in "more confident behaviors, such as intervening in a fight [at school] . . . and reporting incidents to school staff." Four months later, step-mother reported M.S. "has '[c]hanged a lot,'" that M.S. was "'better than before[,]'" and that she "ha[d] no concerns about [M.S.]" In its final status review report, the Department reported M.S.: (1) "appear[ed] to be developing well and age appropriately"; (2) stated she felt "happy and safe" while living with father and step-mother; (3) has made "positive progress in her behaviors"; and (4) appeared "to be well bonded, thriving, and growing under [father's] care[.]"

Furthermore, the record demonstrates father is invested in M.S.'s mental health, has been involved in her services, and will ensure she continues to receive them in the future. Prior to her enrollment in Wraparound Services, father regularly participated in conjoint therapy with M.S. On several occasions, he also contacted M.S.'s therapist to address his concerns when M.S.

13

became upset. Following her graduation from Wraparound Services and return to community-based therapy, father consistently participated in family therapy with M.S. and attended collateral sessions with her therapist to support her mental health goals. In its final status review report, the Department observed father remained motivated to ensure M.S. continued to make progress in her mental health goals and experienced less anxiety in the future.

Additionally, we are not persuaded by mother's argument that the Department's reports of M.S.'s progress are belied by her own comments at the twelve-month status review hearing. There, M.S. asked to address the court shortly after mother's counsel argued she was still at risk of emotional abuse by father, and the juvenile court rejected that argument, found further supervision was not required, and granted the parents joint legal and physical custody with M.S. primarily residing with father. She stated: "There's just one thing I need to say because . . . you guys are saying that my dad . . . does things to me. Now you said you want me to go to the custody of father when you guys are saying he manipulates me and says things to me. My father doesn't do anything. [¶] My father . . . helps me. He studies with me. And I don't know how you guys could say that. And I think it's better if I see a specialist who can find something better for me because I'm already tired of living like this to be honest. . . . I think I need a specialist to see me with respect to me and what could go better for me in my future." In response, the court directed M.S.'s counsel to "explain to her what happened [at the hearing] and what that means for her."

Taken in context, M.S.'s comments do not establish she "recognized that continued juvenile court intervention was

necessary," as mother contends. Rather, M.S.'s remarks indicated she: (1) did not want the juvenile court to be involved in her life any longer; (2) firmly disagreed with mother's counsel's contention that father had emotionally abused her in the past and posed a risk of abuse in the future;[5] (3) believed that a "specialist," rather than the lawyers involved in her dependency case, would be better qualified to determine the arrangements that would best suit her needs; and (4) may not have fully understood the rulings made at the hearing.

Accordingly, we conclude mother has not shown the trial court's finding that, despite father's failure to participate regularly in court-ordered services, the conditions giving rise to jurisdiction under section 300, subdivision (b) did not exist, and were not likely to exist upon the withdrawal of supervision, is unsupported by substantial evidence. She has therefore also failed to demonstrate "'the evidence compels a finding in [her] favor . . . as a matter of law. [Citation.]'" (*Aurora P.*, *supra*, 241 Cal.App.4th at p. 1163; see also *id.* at p. 1164 [minors' failure to satisfy substantial evidence standard demonstrated their inability to satisfy heightened standard].)

---

5      At the six-month status review hearing, mother's counsel also relied on Dr. Crespo's report to argue supervision was necessary because father was emotionally abusing M.S. As she did at the twelve-month status review hearing, M.S. disagreed with those assertions, stating: "Right now what I just heard [was] that supposedly my dad's abusing me and not taking care of my mental health, that's a lie right there. So I just want to say that my dad's not abusing me at all. He's taking care of me, doing the best to protect me. And [what] I heard . . . is making me mad. And I don't like hearing what they said [about] my dad."

## B. Jurisdiction Under Section 300, Subdivision (c)

The evidence is also sufficient to rebut the presumption that M.S. remains at risk of serious emotional harm due to father repeatedly alleging she was abused while in mother's care, thereby subjecting her to excessive interviews by social workers, medical personnel, and police officers.

As an initial matter, the record reflects that following the petition's adjudication, M.S. did not engage in self-harm or report any emotional problems in response to speaking with social workers or being examined by other individuals involved in this dependency case. Rather, between July 2019 and the termination of jurisdiction in September 2020, M.S. consistently reported her anxiety and self-harming behaviors were triggered by: (1) mother calling her names and speaking to her negatively; (2) being around mother and step-father, who fought frequently and reportedly visited her at school to talk to her against her will; and (3) feeling pressured to return to mother's care, visit mother, have contact with mother, or attend conjoint therapy with mother.

Next, we acknowledge mother correctly points out father has continually expressed concerns about M.S.'s safety while in mother's care, even after M.S. was no longer seeing mother and was residing with him. The evidence, however, demonstrates father is unlikely to make additional allegations of abuse or demand further investigation into prior allegations in the future. Due to his ongoing concerns, in June 2020, M.S. participated in a forensic examination at father's request to rule out any undisclosed physical or sexual abuse. The record does not indicate M.S. reported any emotional problems or that she

16

engaged in any self-harm due to the examination. Father stated "he had . . . 'peace of mind' after the exam results reported no child safety concerns for [M.S.]."

Moreover, the record demonstrated the parents' custody dispute has largely come to rest. As noted above, by participating in mediation, the parents agreed to allow M.S. to reside primarily with father in order to respect her wishes and accommodate her mental health needs. This custodial arrangement remained in place without incident through the termination of jurisdiction, and has been beneficial to M.S. who, as noted above, has consistently reported feeling safe and happy while residing with father. While mother desires to visit M.S. and begin conjoint therapy with her to improve their relationship, she understands M.S.'s mental health is paramount. Thus, mother has respected M.S.'s boundaries and has not had contact with her since August 2019 to avoid triggering her anxiety and/or self-harming behaviors. The juvenile custody order grants the parents joint legal and physical custody, adopts the custodial arrangement above, and permits the parents to determine parenting time in light of M.S.'s preferences and needs in the future.

Finally, we are not persuaded by mother's contention that Dr. Crespo's report unequivocally demonstrates continued jurisdiction was necessary. Dr. Crespo opined father "poses a risk of emotional harm to [M.S.]" because he did not recognize how his repeated efforts to prove she had been abused in mother's care had a "negative emotional impact" on her. As the juvenile court correctly acknowledged, however, the report was outdated by the time of the twelve-month status review hearing in September 2020; it was completed in January 2020 and was based on a single interview with father conducted that month. Therefore, the

17

report did not account for or address much of the evidence discussed above, which shows father is unlikely to make future attempts to prove M.S was abused while with mother in the past.

Accordingly, for the reasons discussed above, we conclude mother has not established the trial court's finding that, even though father did not participate regularly in court-ordered services, the circumstances initially justifying jurisdiction under section 300, subdivision (c) no longer existed and were not likely to exist upon withdrawal of supervision, is unsupported by substantial evidence. Consequently, she also has not "show[n] by undisputed facts that the juvenile court erred as a matter of law" when it terminated jurisdiction. (*N.O.*, *supra*, 31 Cal.App.4th at p. 926; see also *Aurora P.*, *supra*, 241 Cal.App.4th at p. 1164.)

## DISPOSITION

The order terminating dependency jurisdiction is affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

CURREY, J.

We concur:

MANELLA, P.J.

COLLINS, J.

19