Filed 6/6/24  In re E.P. CA4/1

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## COURT OF APPEAL, FOURTH APPELLATE DISTRICT

## DIVISION ONE

## STATE OF CALIFORNIA

| | |
|---|---|
| In re E.P. et al., Persons Coming Under the Juvenile Court Law. | |
| SAN DIEGO COUNTY HEALTH AND HUMAN SERVICES AGENCY, | D083511 |
| Plaintiff and Respondent, | (Super. Ct. Nos. J521312A-C) |
| v. | |
| L.P., | |
| Defendant and Appellant. | |

APPEAL from an order of the Superior Court of San Diego County, Marissa A. Bejarano, Judge.  Affirmed.

Richard Pfeiffer, under appointment by the Court of Appeal, for Defendant and Appellant.

Claudia G. Silva, County Counsel, Lisa M. Maldonado, Chief Deputy Counsel, and Elisa Molk, Deputy County Counsel, for Plaintiff and Respondent.

L.P. (Mother) appeals from the juvenile court's January 17, 2024 dispositional order removing three of her five children (the Children) pursuant to Welfare and Institutions Code[1] section 361, subdivision (c). She contends the removal of E.P., P.P., and A.G. (then ages 13, 12, and 11) was not supported by sufficient evidence and there were other reasonable means to protect the Children. She also asserts minors' counsel failed to advise the court of the Children's wishes.

We conclude substantial evidence supports the order, and minors' counsel adequately advised the court of the Children's wishes. Accordingly, we affirm.

REVELANT FACTUAL AND PROCEDURAL BACKGROUND.[2]

A. *Detention Report dated October 4, 2023*

On September 29, 2023, the San Diego County Health and Human Services Agency (Agency) received information that E.P. had several bruises and gashes on her arm. E.P. reported Mother had been " 'hitting her almost every day,' " had thrown pieces of wood and a hammer toward her, and E.P. had tried to protect her younger sisters. P.P. and A.G. " 'corroborated' " the information provided by E.P. and expressed fear of going home. The Children were detained and transported to Polinsky Children's Center (PCC).

Mother also has nine-month-old twins (the twins), whose father committed suicide in June 2023. The San Diego Police Department

---

[1]    All further statutory references are to the Welfare and Institutions Code unless otherwise indicated.

[2]    We limit the factual and procedural background to issues raised in Mother's appeal. The Children's father resides in Mexico and did not request custody of the children or appeal the juvenile court's order.

conducted a welfare check and did not have any concerns with Mother's care of the twins.

On October 2, 2023, a social worker interviewed the Children at PCC. E.P. reiterated that Mother hit her multiple times per week and explained the fading bruise on her arm was from Mother hitting her with a belt using both the buckle and leather part. She also reported Mother throwing things at her and her siblings; one time, Mother threw a scooter at P.P., hitting her in the head and causing it to bleed. E.P. said that Mother blames her for the suicide of the twins' father. E.P. felt "guilty and sad" for telling him she wanted him " 'to leave and be gone,' " but she had only meant that she didn't want him to live with them.

P.P. was in tears and declined to speak with the social worker.

A.G. reported that Mother hits her and had recently pinched her because she didn't clean the bathroom floors, leaving a mark on the top of her right hand. A.G. also said Mother hits E.P. "the most" and would call E.P. a " 'pig' " because she didn't clean or listen. The last time Mother hit E.P., A.G. closed her eyes to avoid seeing it and heard " 'glass breaking' " and things being thrown around.

The social worker also interviewed Mother, who denied inflicting the marks found on the Children and suggested the marks on E.P.'s arm were self-inflicted and the marks on A.G.'s hand were caused by her sister P.P. pinching her. According to Mother, the Children were " 'over exaggerating,' " " 'manipulative,' " and " 'lying.' " She explained that E.P. manipulates A.G. and P.P. to say and do what she wants and believed the Children were mad at her for having another baby and threatening to send them to live with their father in Mexico.

3

Mother denied hitting the Children multiple times a week but admitted to " 'spanking' " the children for not listening up to three times in the past using a belt on their buttocks with their clothes on.  She told the social worker that if the Children were truly fearful of her, her home would be " 'cleaner' " because they would make sure they listened.

Mother also denied blaming E.P. for her partner's suicide and thought that E.P. engaged in self-harm because of the stress of losing him and because she was being bullied at school.  In addition to cutting herself, E.P. had made statements about harming herself, animals, and her younger siblings, but Mother had not been able to secure mental health services for her.  Although she took E.P. to the county mental health hospital, E.P. was unwilling to complete the intake.  Mother was not open to medications but had reached out E.P.'s school and placed E.P. on a waiting list for mental health services on weekends.

B.  *Dependency Petitions and Detention*

On October 3, 2023, the Agency filed dependency petitions (petitions) alleging Mother engaged in excessive discipline that subjected E.P. and A.G. to serious physical harm or substantial risk of serious physical harm (§ 300, subd. (a)), and as a result, subjected P.P. to substantial risk of abuse or neglect (§ 300, subd. (j)).

The following day, the juvenile court ordered the children detained at PCC but gave the Agency discretion to move the children to the home of an approved relative or extended family member and permitted liberal supervised visitation with Mother.  It also ordered voluntary services, including case management, counseling, transportation and parent training, to effectuate reunification.

4

C. *Jurisdiction/Disposition Report dated October 31, 2023*

On October 5, 2023, the Children moved into their maternal aunt and uncle's home. Mother continued to blame the Children and deny any wrongdoing but started taking parenting classes, had scheduled an intake to begin child abuse classes, and was on a waitlist to receive grief counseling.

E.P. continued to feel unsafe and was not willing to visit with Mother. A.G. was doing well and felt happier in her maternal aunt's care, and she vacillated between wanting to see Mother and the twins to not wanting to visit with them. P.P. was still not ready to be interviewed by the social worker. The maternal aunt reported P.P. was doing well and appeared happy and wanted to visit with Mother and the twins.

The Agency recommended that the court make a true finding on the allegations in the petitions, declare the Children dependents of the juvenile court and place the Children in the approved relative home, offer Mother reunification services and supervised visits.

At the outset of the October 31, 2023 hearing, the juvenile court held a *Marsden* hearing[3] and denied Mother's motion to replace her appointed counsel. Minor's counsel then informed the juvenile court that all three children wanted to continue to be placed with their maternal aunt and had requested additional clothing. Mother had purchased clothing for the Children, but they didn't like the colors or style, and Mother was in the process of moving and had packed up the Children's old clothing.

The juvenile court ordered the Agency to provide the Children with additional clothing and to hold an emergency child family and team meeting

---

3    *People v. Marsden* (1970) 2 Cal.3d 118.

to address visitation, mental health services, additional clothing for the children, and P.P.'s asthma.  The court scheduled a pretrial hearing for January 9, 2024, followed by the contested jurisdiction and disposition hearing on January 17, 2024.

  D. *Addendum reports dated January 9, 2024 and January 17, 2024*

  In mid-November, the Children began working with a therapist, and P.P. and A.G. began supervised visits with Mother.  P.P. and A.G. attended the visits and seemed to enjoy them, but E.P. continued to refuse any contact with Mother.

  On November 27, 2023, the caregiver informed the social worker that P.P. and A.G. reported seeing changes in Mother.  They felt she was " 'nicer' " and asked about overnights or return to Mother.  The social worker noted that as "a good sign" and would review Mother's services to ensure she was making the necessary changes to expand visitation.

  After a visit on December 26, 2023, Mother informed the supervising social worker that P.P. had told her that E.P. was cutting herself at night.  The caregiver reported that she had not seen any new marks on E.P. to indicate she was cutting.  Two days later, the assigned social worker took photos of E.P.'s arms, noted that the scars did not appear recent, and interviewed each of the Children privately.  E.P. denied cutting since she left Mother's home, P.P. wasn't sure if she told Mother E.P. was recently cutting herself, A.G. had not seen E.P. cutting and did not see any new cuts since the Children had been with the caregivers.

  The social worker also asked the Children about visitation.  P.P. and A.G. had expressed that they would like to return to Mother's care.  P.P. felt Mother had changed, noting her " 'voice is not how it used to be.' "  P.P. felt safe with Mother and had not experienced what her sisters experienced; she

6

listened to Mother and was not yelled at or disciplined. A.G. wanted to return to Mother's care because she felt Mother was doing well and had assured her that " 'things won't be like before.' " E.P., on the other hand, told the social worker that she was still not ready to see or speak with Mother.

Mother reported she was participating in a child abuse group, parenting classes, individual therapy, DV classes, and virtual suicide loss survivors' grieving groups. Mother also submitted five letters of support, four from her friends and one from the board president of Uplift homeless ministry, expressing that they had always observed Mother being loving and attentive toward the Children.

On January 16, 2024, the caregiver notified the social worker that E.P. had participated in her first visit with Mother.

The social worker had not yet received any updates or reports from Mother's service providers and found Mother's progress to be minimal. The Agency recommended the juvenile court find the allegations in the petitions true and order removal of the Children from Mother's custody with continued supervised visitation. The Agency's case plan included potential reunification at the end of April, 2024 and recommended that Mother continue to receive individual and grief counseling, successfully complete parenting education, continue to participate in the child abuse group to address the use of physical discipline.

E. *Contested jurisdiction/disposition hearing*

The jurisdiction/disposition hearing was held on January 17, 2024. After the Agency reports and attachments were admitted into evidence without objection and the parties waived cross-examination of the social worker, three witnesses testified on Mother's behalf. The Children's maternal grandmother testified that she cared for the Children while Mother

7

was working and would leave when Mother returned. She never witnessed her daughter neglect, abuse, or physically hurt the Children. She specifically testified that she never saw her daughter get frustrated with the Children, throw objects at them, or hit them with a belt or other object. She only once observed a bruise on one of her granddaughters, who said the cat had scratched her.

Mr. Sandoval (Sandoval) testified he had known Mother for approximately two years and provided her with moral support after she lost her partner to suicide. In addition to speaking with Mother on the phone almost daily, Sandoval visited the family's home on three occasions and helped care for the twins. He described E.P. as a rebellious teenager who did not listen to Mother and manipulated and controlled her younger sisters, and described Mother as a struggling single mom who was doing her best while going to school and working to provide for her family.

Sandoval observed that P.P. and A.G. always listened to Mother, while E.P. responded negatively by not doing what she was told, rolling her eyes, grunting, walking away, or throwing things. He witnessed Mother respond with patience despite her disappointment. He had never heard Mother raise her voice, neglect, or abuse the Children.

Mother also testified. She explained that she and the Children had been significantly impacted by her partner's suicide. In addition to her grief, caring for the twins was difficult without the help of her partner, and the children didn't like helping with the twins or doing chores.

Before her partner passed away, Mother would physically discipline the Children by spanking their behinds with a belt over their clothes. She stopped physically disciplining the Children because it wasn't working and began experimenting with other methods of discipline such as having the

8

Children stand still and reflect on their behavior until they apologized. She denied abusing the Children or that her physical discipline was excessive. She also denied throwing a scooter at P.P. and throwing a hammer or piece of wood at E.P.

She testified that the Children physically fought with each other by pulling hair, pinching, punching, and kicking. Mother would separate them, but their fighting sometimes resulted in marks. Approximately one week before the Children were detained, Mother noticed marks on E.P.'s arms that were indicative of self-harm. When she asked if they were self-inflicted, E.P. said she was scratching herself. Mother suggested E.P. talk with someone, but E.P. didn't want to and had previously refused mental health services. Mother expressed continued concern for E.P.'s mental health and had requested a mental health evaluation. She was open to the Children attending therapy and taking medication should it be prescribed.

Mother was also taking parenting classes and child abuse classes. She had taken approximately eight child abuse classes over the past two months. The classes were nearing completion, but there had been no mention of physical abuse. Mother was learning how to effectively speak to children to avoid blaming or overwhelming them. She was "still learning how to deal with preteens" and described her conflict negotiation skills as "not good."

F. *Juvenile court's ruling*

At the conclusion of the contested jurisdictional and disposition hearing, the juvenile court found the allegations in the petitions true, declared the Children to be dependents of the juvenile court, ordered removal, and continued placement in their maternal aunt's home.

The court found Mother's statements denying the abuse were not credible while finding the Children's reports of the history of repeated

9

physical abuse and the injuries inflicted by Mother leading to the Children's detention were credible. The court found by clear and convincing evidence that removal from Mother was necessary and concluded there is or would be a substantial danger to the physical health, safety, protection or physical or emotional well-being of the Children if they were returned home.

The court further found there were no reasonable means by which the Children's physical and emotional health could be protected short of their removal from Mother's custody. The court considered Mother's suggestions of family therapy and unannounced visits but did not believe those means could adequately protect the Children as "the abuse had been ongoing and was happening nearly daily."

The court ordered liberal supervised visits with both parents, 12 months of family reunification services, and scheduled the six- and 12-month review hearings.

Mother filed a timely appeal.

## DISCUSSION

### A. *Standard of Review*

Section 361, subdivision (c)(1) provides a child may not be taken from the custody of his or her parents unless the juvenile court finds by clear and convincing evidence that "[t]here is or would be a substantial danger to the physical health, safety, protection, or physical or emotional well-being of the minor if the minor were returned home, and there are no reasonable means by which the minor's physical health can be protected without removing the minor from the minor's parent's . . . physical custody."

When reviewing a dispositional order made by the juvenile court pursuant to the clear and convincing standard, the appellate court must determine if it is supported by substantial evidence while " 'bearing in mind

10

the heightened burden of proof' " in the court below.  (*In re Hailey T.* (2012) 212 Cal.App.4th 139, 146 (*Hailey T.*).)  The question before us is not whether we regard the evidence supporting the court's order is clear and convincing; "it is whether a reasonable trier of fact could have regarded the evidence as satisfying this standard of proof." (*Conservatorship of O.B.* (2020) 9 Cal.5th 989, 1009 (*Conservatorship of O.B.*).)  We view the record in the light most favorable to the juvenile court's order and indulge in reasonable inferences that the juvenile court might have drawn from the evidence. (*Conservatorship of O.B.*, *supra*, 9 Cal.5th at pp. 1008–1009.)  We must accept the juvenile court's resolution of conflicting evidence, and we may not insert our own views regarding the credibility of witnesses in place of the assessments conveyed by the judgment.  (*Ibid.*)

B. *Substantial Evidence Supports the Juvenile Court's Finding of Substantial Danger to the Children*

Mother claims the trial court's dispositional order should be reversed "[b]ecause the juvenile court failed to see the changes in Mother, and instead used facts as they existed at the time of the filing of the petition instead of facts at the time of the jurisdiction/disposition hearing."  Mother fails to recognize the juvenile court may properly consider "parents' past conduct as well as present circumstances." (*In re Cole* (2009) 174 Cal.App.4th 900, 917 (*Cole*).)  Mother did not satisfy her burden on appeal to show "there is no evidence of a sufficiently substantial nature to support the court's findings or orders." (*Hailey T.*, *supra*, 212 Cal.App.4th at p. 147.)  Mother's own testimony, along with the additional evidence contained in the Agency's reports, including the October 4, 2023 detention report, the October 31, 2023 jurisdiction/disposition report, and the two addendum reports dated

11

January 9, 2024 and January 17, 2024, constitute substantial evidence supporting the removal order.

Mother admitted that she physically disciplined the Children by spanking their behinds with a belt over their clothes., and the Agency's reports contain detailed information of Mother's pattern of repeated abuse that posed a substantial danger to the Children's physical safety and well-being. Although Mother testified that she had stopped using physical discipline because "it didn't work" and had suggested the Children themselves had inflicted the marks observed, the court found Mother was not credible. We defer to the juvenile court's credibility determinations, and the juvenile court properly concluded the evidence satisfied the clear and convincing standard of proof. (See *Conservatorship of O.B.*, *supra*, 9 Cal.5th at pp. 1008–1009.)

Even if we were to accept Mother's argument that she only physically abused the children in the past, "case law has long construed section 361 as allowing removal where 'return of the child would create a substantial risk of detriment to the child's physical *or* emotional well-being" and that California Rules of Court, rule 5.695(d)(1) confirms that construction. (*In re H.E.* (2008) 169 Cal.App.4th 710, 719; see also *In re Marilyn H.* (1993) 5 Cal.4th 295, 302.) The focus of the removal statute is to avert harm to the child. (*In re Jamie M.* (1982) 134 Cal.App.3d 530, 536; see also *Cole C.*, *supra*, 174 Cal.App.4th at p. 917 ["The parent need not be dangerous and the child need not have been actually harmed for removal to be appropriate"].)

Although Mother was still engaged in services at the time of the dispositional hearing and her two younger daughters observed she was " 'nicer' " and requested overnight visits, she was still early in the process. It had been less than four months since the Children had been initially

12

detained, and Mother had not acknowledged that her communication and disciplinary methods were harmful to the Children. (See *Cole C.*, *supra*, 174 Cal.App.4th at p. 918 [child not safe in mother's care until she "acknowledged the inappropriate nature of her parenting and disciplinary methods"].)

Substantial evidence supports the juvenile court's order, and it will not be disturbed on appeal.

C. *Substantial Evidence Supports the Juvenile Court's Finding of No Alternative Means to Protect the Children*

Before the juvenile court removes a child from parental custody, it must find there are no reasonable means by which the child's physical health can be protected without removal. (§ 361, subd. (c)(1).) The juvenile court has broad discretion in making a dispositional order (§ 361, subd. (c)), and it properly considered and rejected the alternatives to removal in this case.

The juvenile court specifically considered family therapy and unannounced visits as suggested by Mother's counsel but found those means could not adequately protect the children considering "the abuse had been ongoing and was happening nearly daily." The juvenile court had found there was substantial risk to the Children after considering the nature of the abuse, Mother's mental condition, and the stressors Mother had experienced caring for the twins since the untimely death of her partner.

Mother's conflict negotiation skills were "not good,"( and she was "still learning how to deal with preteens . . . [and] how to speak to children in different ways." Mother did not express any remorse, and although she was attending parenting and child abuse classes, none of her classes had addressed physical abuse. (Cf., *In re Ashly F.* (2014) 225 Cal.App.4th

13

803, 810 [reasonable means to protect child in the home "given the mother's expression of remorse and enrollment in a parenting class"].)

### D. *Minor's counsel adequately advised the juvenile court of the Children's wishes*

Mother asserts in the conclusion of her opening brief that minors' counsel failed to advise the court of the Children's wishes are required by section 317, subdivision (e)(2). A "primary responsibility" of minor's counsel "is to advocate for the protection, safety, and physical and emotional well-being of the child." (§ 317, subd. (c)(2).) Minor's counsel is required to "interview the child to determine the child's wishes and assess the child's well-being" and "advise the court of the child's wishes." (§ 317, subd. (e)(2).) However, "[c]ounsel shall not advocate for the return of the child if, to the best of his or her knowledge, return of the child conflicts with the protection and safety of the child." (*Ibid.*)

Mother's assertion is belied by the record. At the hearing, minors' counsel stated: "As to disposition, the girls did want me to stress to the court some of their positions and specifically at this time [E.P.] does not want to return home. [P.P.] would like to live with mother; but in the alternative, she would like to stay with her aunt. And that is all three of the kids' position as to where they would like to stay. ¶ As guardian ad litem, I would argue that the minors remain placed with the aunt. I believe there is enough evidence to show that they should be detained out of [M]other's home, and I would submit on the report."

To the extent minors' counsel inadvertently failed to specifically address A.G.'s wishes, counsel's error was harmless as the Agency's January 9, 2024 addendum report included A.G.'s wishes to return to

14

Mother's care.  (See, by analogy, *In re N.O.* (2019) 31 Cal.App.5th 899, 936–937.)


## DISPOSITION

The January 17, 2024 dispositional order is affirmed.


                                          O'ROURKE, Acting P. J.

WE CONCUR:



DATO, J.



DO, J.