Filed 3/23/26  In re P.S. CA4/3

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION THREE

| | |
|---|---|
| In re P.S. et al., Persons Coming Under the Juvenile Court Law. | |
| ORANGE COUNTY SOCIAL SERVICES AGENCY,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>CHRISTOPHER S.,<br><br>    Defendant and Appellant. | G066091<br><br>(Super. Ct. Nos. 25DP0743, 25DP0744)<br><br>O P I N I O N |

Appeal from an order of the Superior Court of Orange County, Adrianne E. Marshack, Judge. Affirmed.

Lauren Johnson-Norris, for Defendant and Appellant.

Leon J. Page, County Counsel, Debbie Torrez and Deborah B. Morse, Deputy County Counsel, for Plaintiff and Respondent.

No appearance for the Minors.

\* \* \*

Christopher S. (the father) appeals the juvenile court's dispositional order removing the minors P.S. and H.S. (the children) from his custody and placing them with the mother, K.S., who resides in Nevada. He contends the court lacked substantial evidence in support of the order. We disagree with both of the father's arguments and affirm the court's dispositional order.

STATEMENT OF FACTS AND PROCEDURAL HISTORY

The father contests only the dispositional order. Accordingly, while we have read all of the briefs and reviewed the entire record, we summarize the facts that are most pertinent to that order.

I.

SUMMARY OF FAMILY HISTORY

As of June 2025, the father had custody of the children, who were eight and five years old. The parents divorced in 2024. The dissolution judgment awarded joint legal custody with physical custody to the father and reasonable visitation for the mother.

The father and the children lived with the father's girlfriend, O.F. According to several sources, the father had untreated mental health issues, including posttraumatic stress disorder (PTSD) and multiple suicide attempts. One of the suicide attempts had led to a hospitalization out of state.

The mother lived in Las Vegas, Nevada. Prior to moving, she had served in the Navy for one year and stated she received an honorable discharge. She had moved to Las Vegas to attend college while the father was in the military. She had left the children in the care of the paternal grandparents during this time "due to school and work," making the decision not to uproot them. She had also been struggling with postpartum

2

depression. The mother had not visited the children since November 2024. She alleged the father had impeded attempts to remain in contact with the children.

The mother had diagnoses of major depressive disorder and PTSD. The mother had been attempting to regain custody since April 2025. Her "current mental health evaluation recommended trauma-focused therapy, ongoing medical care for migraines, and lifestyle adjustments to support her mental health."

There had been previous reports to the Orange County Social Services Agency (SSA) about the children while they were living with the father and O.F. that had been determined to be substantiated and inconclusive, respectively. The reports included claims that P.S. had engaged in sexually inappropriate behaviors at school. It was further reported P.S. had witnessed domestic violence and a claim that he had been present during a suicide attempt by the father. P.S. had also mentioned killing himself twice when he had been upset at home.

In January 2025, a form O.F. completed for P.S.'s school "indicated the child has been exposed to some ugly fights that were very loud and emotional due to the father's threatening to leave them or end his life." An ambulance had come to their home three times in the past year to evaluate the father.

## II.

### DETENTION

On June 27, the Orange County Sheriff's Department (OCSD) responded to the family home due to a physical altercation between the father and O.F. H.S., the younger child, who was present in the home at the time, began crying during the incident. The father reported he and O.F. had

3

an argument, and she began yelling and cursing at him, and attempted to throw a mop. She threw a mop bucket filled with dirty water at him, and he poured a smoothie on her in response. The father said O.F. struck him several times, and they both began throwing various items inside the home.

For her part, O.F. admitted "she lost control" and that she and the father were throwing things at each other and yelling. She also stated that at one point they pushed and held each other's arms. With regard to the father's mental health, she reported he had PTSD, previous suicide attempts, and "blackout periods where he cannot recall his behavior."

The younger child, H.S., reported she had heard yelling and things being thrown, including the bucket and the smoothie. She reported crying because the father was yelling at O.F. She further reported that the father and O.F. fought "a lot." The older child, P.S., reported the father had a history of aggressive behavior in the home, including throwing his phone and other objects, causing holes in the wall and punching holes in the wall. P.S. reported the father had attempted suicide twice, had thrown himself through a window, and cut himself with a knife.

The responding OCSD deputy "reported a history of prior service calls to the residence for verbal disputes." The couple engaged in frequent physical altercations, often involving thrown objects and the father punching the walls. On June 27, the deputy noted evidence of past altercations, including a broken door, exposed screws, and holes in the wall. The father was arrested for felony domestic violence, child endangerment and taken into custody. The children were detained.

4

On July 1, SSA filed a dependency petition pursuant to Welfare and Institutions Code section 300, subdivisions (b)(1) and (g).[1] The subdivision (b)(1) allegation asserted substantial risk of harm due to failure to supervise and protect with regard to the domestic violence incident between the father and O.F. It further alleged the father had been unable or had failed to provide care for the children due to his mental illness. [2]

At the detention hearing, the court ordered the children detained from both parents and placed them with the paternal grandparents. The father was authorized a minimum of 12 hours a week of supervised visitation, subsequently liberalized by SSA to unsupervised, and the mother was granted a minimum of six hours a week of unsupervised visitation. SSA was ordered to evaluate the mother's home.

III.

JURISDICTION/DISPOSITION

A. *The Father*

The father did not comment on the allegations of domestic violence during an interview with SSA. With regard to his mental health, he admitted acts of self-harm. He denied that P.S. witnessed him attempt suicide or other acts of self-harm. He admitted telling P.S., who was eight years old at the time, about his suicide attempt, because "he wanted to be honest." He admitted in retrospect that doing so was probably not the best idea. The father also reported having blackout periods where he could not recall his behavior, stating the last such episode was in July 2023,

---

[1] Subsequent statutory references are to the Welfare and Institutions Code.

[2] The subdivision (g) allegations were later stricken.

5

approximately two years before the interview. He was prescribed antidepressant and other medications. He "attributed his suicide attempts to 'things' he saw during his deployment."

The father said he was discharged from the military due to physical disability. He reported having "multiple surgeries, PTSD, Major Depression, Persistent Depressive Disorder, and Generalized Anxiety Disorder." He reported he had been admitted to two inpatient mental health programs, one in Arizona in November 2024, and the other in 2022, both following suicide attempts or ideation. He acknowledged substance abuse issues, but reported that he had been sober since March 2023.

The father denied alienating the children from the mother, stating it was her choice not to visit the children.

With regard to services, the father stated he had been in counseling since July 2024, which was conducted via video call. According to his therapist, the father had not made the therapist aware of his prior suicide attempts. Treatment goals were "improving emotional awareness and communication, utilizing coping and calming strategies, and setting and maintaining healthy boundaries." Progress had "involved ups and downs" but the father appeared to be stabilized and had improved since his separation from O.F.

The father was referred to parenting education and anger management classes. After the referrals, he began participating in classes. He stated he was remaining compliant with his medication. He ended his relationship with O.F.

O.F. was also interviewed by SSA. She disclosed ongoing domestic violence between herself and the father.

*B. The Mother*

The mother was living in Las Vegas during this period and had full-time employment. A home assessment revealed no issues, and the mother had a bedroom set aside for the children. With respect to the ongoing domestic violence between the father and O.F., the mother stated she did not know about it. She stated that during their marriage, there were incidents where the father would throw things.

The mother discussed the past situation with custody. She had not wanted to leave the children with the paternal grandparents when she moved to Las Vegas for school, stating she had been "coerced" into doing so. She stated that once the paternal grandparents began caring for the children, she was no longer allowed to parent. The mother stated she attempted to have as much contact as possible with the children, but had been limited by finances and the father's refusal to allow access.

With respect to her mental health, the mother denied she had any unresolved issues. The mother also said "she had postpartum issues" five years ago, and she was upset that SSA was inquiring about her past mental health when she was not the reason SSA had become involved. She stated she was "not sure" if she had bipolar disorder, but stated "she has trauma from therapy as a child." She attributed her childhood trauma to being sent to a boarding school for two years, after which she went into a group home. The maternal grandmother told her that she was the problem. The mother reported emotional and physical abuse by the maternal grandmother. Due to the therapy she received as a child, she had a lack of trust in the system because it had failed her. The mother was distressed that previous mental health issues were being used "against her five years later." She admitted she was diagnosed with bipolar disorder at the same time she was diagnosed with

7

postpartum depression after the birth of H.S. SSA found the mother had a history of past psychiatric hospitalizations. The social worker found it difficult to address the mother's mental health issues with her, stating that the mother would begin "to spiral emotionally" when the issue was raised. SSA assisted the mother in locating resources for services in Las Vegas, including individual counseling, parenting education, and medication evaluation and monitoring.

As the mother's counseling proceeded, her psychiatrist disagreed with the bipolar diagnosis, because the mother had never had a manic episode. The current diagnosis was PTSD and major depressive disorder. The psychiatrist stated "the mother is extremely high functioning in terms of work and creating social support, she has done well considering the amount of time she was given. She shared that the mother does have historical trauma that she will work on with the mother through their counseling sessions and ongoing treatment." She also began to take local parenting education classes in Las Vegas.

SSA noted that the mother lacked a support system in Las Vegas, was attending school, and her ability to take time off was limited. There had not been any period where the mother had cared for both children independently. By September, however, the mother provided SSA with a detailed written plan for childcare, work, and finances. Her supervisor had agreed to flexibility in her work scheduling, among other things. An Interstate Compact on the Placement of Children assessment was initiated in the event the court placed the children in the mother's care.

C. *The Children*

The children were placed with the paternal grandparents. Overall, they were doing well, and the paternal grandparents were willing to

provide permanency if reunification failed. During this period, P.S. was diagnosed with ADHD and Autism Spectrum Disorder.

With regard to placement, the older child, P.S., stated she did not feel unsafe with the father. He had never lived with the mother. H.S. stated the paternal grandmother had always been her primary caretaker.

Visits with both parents went generally well, although the video visits were sometimes challenging for the children.

*D. Hearing*

The hearing was held on October 6. As to jurisdiction, the parents waived their right to trial and submitted on the allegations. The court found the allegations true and that the court had jurisdiction over the children pursuant to section 300, subdivision (b)(1).

With respect to disposition, each parent argued the children should be placed in their custody. Minors' counsel requested the court adopt SSA's recommendation of reunification services for the parents, along with a transitional plan for the mother "gradually becoming more prepared to have the kids full-time." The county agreed it was in the children's best interests to remain with the paternal grandparents and "transition" to the mother's care.

The court found it did not have any evidence from SSA to suggest that the mother posed a current risk to the children. It did, however, find there was clear and convincing evidence that returning the children to the father would pose a substantial risk to them. The time that had passed since the domestic violence incident which led to detention was not long enough "for the Court to be confident that issues won't resurface."

With respect to the mother, the court did not view the issue as one of abandonment by her, but rather "as a case where circumstances made it such that the parents made decisions in the best interest of the kids even

9

at their own sacrifice." While the law dictated the children must be returned to the mother, the court felt there needed to be a transition plan that was in the children's best interests.

The father filed a notice of appeal from the disposition order.

## DISCUSSION

### I.

### SSA MAY ARGUE IN SUPPORT OF THE COURT'S ORDER

The father contends we should strike or disregard SSA's arguments in support of affirming the order because such arguments are "inconsistent" with its contentions in the juvenile court. The father relies on the principle that a litigant is not permitted to assert a new legal theory on appeal. (See *Brown v. Boren* (1999) 74 Cal.App.4th 1303, 1316.) But there is no new legal theory here. SSA does not offer any new statutes or unexpected legal arguments. We find no reasoned legal principle preventing SSA from advocating for the court's order. Indeed, as a factual matter, SSA's argument is not that different than the position it took below, which recommended a "transition" of custody from the paternal grandparents to the mother.[3] The father's request to strike or disregard SSA's brief is denied.

### II.

### REMOVAL FROM THE FATHER

*A. Relevant Law and Standard of Review*

To order a child removed from a parent's care at the disposition hearing, the court must determine whether there is clear and convincing evidence that "[t]here is or would be a substantial danger to the physical health, safety, protection, or physical or emotional well-being of the minor if

---

[3] SSA argued: "So at this time, we do believe that it's in the children's best interest to remain where they are and transition."

the minor were returned home, and there are no reasonable means by which the minor's physical health can be protected without removing the minor from the minor's parent's . . . physical custody." (§ 361, subd. (c)(1).) To order a child removed, there must be a present risk of harm, although the "court *may* consider past events to determine whether the child is presently in need of [the court's] protection." (*In re A.F.* (2016) 3 Cal.App.5th 283, 289, italics added.)

We review the court's determination under section 361, subdivision (c)(1), for substantial evidence. "Substantial evidence is evidence that is 'reasonable, credible, and of solid value'; such that a reasonable trier of fact could make such findings." (*In re Sheila B.* (1993) 19 Cal.App.4th 187, 199.) "Issues of fact and credibility are questions for the trial court and not the reviewing court. The power of the appellate court begins and ends with a determination as to whether there is any substantial evidence, contradicted or uncontradicted, which will support the conclusion reached by the trier of fact." (*In re Christina T.* (1986) 184 Cal.App.3d 630, 638–639.) "[W]e draw all reasonable inferences in support of the findings, view the record most favorably to the juvenile court's order, and affirm the order even if other evidence supports a contrary conclusion. [Citation.] The appellant has the burden of showing the finding or order is not supported by substantial evidence." (*In re Megan S.* (2002) 104 Cal.App.4th 247, 250–251.)

*B. Substantial Evidence Supports the Court's Removal Order*

The father argues substantial evidence does not support the court's order removing the children from his custody. There were two major issues. The first is domestic violence and the father's general anger issues, and the second is father's mental health.

The father contends that O.F.'s presence was "[t]he sole source of potential danger to the children" with respect to domestic violence, and there was "nothing in the record" to show he had been violent or aggressive outside of his relationship with O.F. The mother stated there had been incidents where the father's anger was displayed by throwing items while denying domestic violence between them.

The children were exposed to the domestic violence between the father and O.F. OCSD deputies "reported a history of prior service calls to the residence for verbal disputes." "[P.S.] has been exposed to some ugly fights." according to a form O.F. filled out for school. H.S. was present during the altercation that led to detention, and she reported that the father and O.F. fought "a lot." She cried during the incident due to the father's yelling. P.S. disclosed the father had a history of aggressive behavior at home, including throwing his phone and other objects, causing holes in the wall, and punching holes in the wall. P.S. told the social worker that the father and O.F. argued five or 10 times per month. The arguments made him sad and made him cry.

The father's history of dealing with his anger through violence demonstrates more than a tempestuous relationship with one partner. It demonstrates a pattern. ""[P]ast violent behavior in a relationship is 'the best predictor of future violence.'"" (*In re L.B.* (2023) 88 Cal.App.5th 402, 411.) Separating from O.F. was not sufficient to eliminate the risk to the children based on the father's history of dealing with anger through violence.

There was little in the record to demonstrate the father had faced the facts regarding his history of domestic violence or use of violence. During interviews with SSA, he blamed O.F. for the domestic violence, calling her the "instigator" of the incident that led to detention.

12

While the father was participating in individual therapy, his treatment goals were "improving emotional awareness and communication, utilizing coping and calming strategies, and setting and maintaining healthy boundaries." The only efforts to address the father's domestic violence history and use of violence in therapy were "calming strategies." The father did not disclose his history of suicidal ideation to his therapist. While the father took an anger management class,[4] there is no indication it addressed domestic violence.

The father's mental health issues were not entirely separate from his use of violence to deal with anger, but his mental health was an ongoing and serious concern. The father had attempted suicide at least once while at home and while the children were present. As late as November 2024, he had been hospitalized out of state. He also exercised poor judgment when it came to disclosing his mental health to his children, informing then eight-year-old P.S. about his suicide attempt. He reported having blackout periods where he could not control his behavior. There is no question that the father's mental health issues posed a continuing, substantial risk to the children.

The father also argues there was insufficient evidence of no reasonable means of protecting the children absent removal. He suggests things the court *could* have ordered instead of removal. There is no indication in the record that the father proposed the "reasonable means" he now mentions, which include an order mandating continuing services, a

_____

[4] The father spends much time of his briefs reviewing the services he completed. We are aware that he has made positive steps; indeed, the court expressed its belief that the father would be able to reunite. But on substantial evidence review, the question is whether there is sufficient evidence to uphold the court's decision, not whether there is also evidence that would have supported a different outcome.

13

restraining order as to O.F., and requiring the paternal grandparents to reside with the father and the children. The father cannot offer such arguments for the first time on appeal. (*In re N.O.* (2019) 31 Cal.App.5th 899, 935.)

Even if he could legally make such arguments, they are without merit. Continued services were proposed in the case plan, but that was not sufficient to stop the court from finding removal was necessary. Similarly, the court was aware that O.F. and the father had separated and did not find that to be sufficient to alleviate the danger to the children. A restraining order would not have changed things, particularly in the absence of evidence of continued contact. As to the grandparents, the court did not have the power to order them to leave their home and move in with the father.

Finally, the father contends the court did not state the facts on which the removal from the father was based. We disagree. The court found the domestic violence and mental health issues could "resurface" and were therefore unresolved. Moreover, there is no reasonable likelihood that if the court had expanded on its reasoning that the result would have been different. (See *In re D.P.* (2020) 44 Cal.App.5th 1058, 1068.) The record, unlike the record in *In re D.P.*, reflects that the court was aware of and had considered the relevant facts.

### III.

#### PLACEMENT WITH THE MOTHER

The father next contends the court erred when it placed the children with the mother, arguing it was detrimental to their safety, protection, and emotional well-being.

*A. Relevant Law and Standard of Review*

Section 361.2 addresses the situation present here, where a noncustodial parent wishes to assume custody following a removal. "If a court orders removal of a child pursuant to Section 361, the court shall first determine whether there is a parent of the child, with whom the child was not residing at the time that the events or conditions arose that brought the child within the provisions of Section 300, who desires to assume custody of the child. If that parent requests custody, the court shall place the child with the parent unless it finds that placement with that parent would be detrimental to the safety, protection, or physical or emotional well-being of the child." (§ 361.2, subd. (a).)

The statutory language is clear. Unless the court finds placement with the noncustodial parent would be "detrimental to the safety, protection, or physical or emotional well-being of the child," it "shall" place the child with the parent. "The burden is on the party opposing placement to show the child will be harmed if the noncustodial parent receives custody." (*In re A.T.* (2025) 110 Cal.App.5th 722, 736.) Findings of detriment require clear and convincing evidence. (*Ibid.*)

On appeal, we review the court's findings for substantial evidence. (*In re A.T., supra,* 110 Cal.App.5th at p. 736.) "We view the record in the light most favorable to the prevailing party and give due deference to how the trier of fact may have evaluated the credibility of witnesses, resolved conflicts in the evidence, and drawn reasonable inferences from the evidence." (*In re M.V.* (2022) 78 Cal.App.5th 944, 960.)

*B. Substantial Evidence Supports the Court's Order*

The court found there was not clear and convincing evidence that placing the children with the mother would be detrimental. We agree. The

15

father focuses on the mother's mental health issues, arguing that in 2025, the mother was still "severe[ly] impaired." The father bases this argument on the mother's treating psychologist's diagnosis of PTSD, depression and recommendation of trauma-focused therapy and lifestyle adjustments. He does not offer supporting evidence that this diagnosis would necessarily prevent the mother from parenting her children. At the time of disposition, her therapist opined that the mother was high functioning with no cognitive impairment that would limit her ability to care for the children. She was actively participating in therapy and was taking a parenting class. The psychiatric nurse who evaluated her opined that the mother did not require ongoing psychiatric medication. The psychiatric nurse told SSA that the mother had "no current symptoms or concerns that would interfere with her ability to function day to day" and that she "appears competent to care for her children safely."

The father also contends the family's history and the mother's current living situation support his claim of detriment, but in doing so, he disregards many relevant facts. The mother submitted a written document to the social worker demonstrating that she had childcare arrangements, a budget, housing, and employment.

The father further contends that the court's order for a transition plan from the paternal grandparents to the mother indicates placement with the mother would be detrimental. We disagree, and find no support for that contention in the record. The court was within its discretion to order a period of transition in the best interests of the children prior to the mother taking custody.

In sum, we find no error. The father has not demonstrated a lack of substantial evidence to support the finding that placement with the mother would be detrimental within the meaning of section 361.2.

## DISPOSITION

The juvenile court's dispositional order is affirmed.


MOORE, ACTING P. J.

WE CONCUR:


GOODING, J.


SCOTT, J.